Revised August 2, 1999

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

**No. 98-20351**
_____

**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,**

Plaintiff - Appellant,

**MARY BOYLE,**

Intervenor Plaintiff - Appellant,

**VERSUS**

**R.J. GALLAGHER COMPANY,**

Defendant - Appellee.

_____

Appeals from the United States District Court
for the Southern District of Texas
_____

July 15, 1999

Before WIENER, DeMOSS, and PARKER, Circuit Judges.

DeMOSS, Circuit Judge:

The Equal Employment Opportunity Commission and Mary Boyle, executrix of the Michael Boyle estate, appeal the district court's adverse grant of summary judgment on their claims that R.J.

Gallagher Company breached an employment contract and violated the Americans with Disabilities Act when Michael Boyle was demoted from his position as president and subjected to a fifty-percent reduction in salary. Boyle also alleges that the filing of a lawsuit against him constituted unlawful retaliation under the ADA. We conclude that a material factual dispute precludes a determination on summary judgment that the company did not breach its employment contract with Boyle. We also conclude that there is a material factual dispute concerning whether Boyle had a record of disability or was regarded as having a disability. Finally, we conclude that the filing of a lawsuit does not trigger the ADA's anti-retaliation provisions. Accordingly, we affirm in part, vacate in part, and remand for further proceedings.

## I.

In this appeal from summary judgment entered in favor of the employer, we consider the facts of the case in the light most favorable to the appellants.

Michael Boyle worked for over twenty years for R.J. Gallagher Company (hereinafter, "Gallagher Co."), a distributor of steel pipe, valves, and tube. Over the course of his employment he worked his way up from salesman to president. In February 1990, when Boyle was executive vice president, Boyle and Gallagher Co. entered into an employment agreement under which Boyle would earn

an annual salary of $205,000. That agreement provided that it would "automatically be renewed for consecutive one-year periods, unless either party gives notice to the other that said party does not intend to renew and extend this agreement." The agreement was modified in February 1991 to extend Boyle's employment term to three years.

In February 1993, Boyle was promoted to president. Over the course of his tenure as an executive of Gallagher Co., Boyle was routinely praised for the excellence of his job performance. Robert Gallagher, Jr. (hereinafter, "Gallagher"), chief executive officer and chairman of the board of Gallagher Co., told Boyle in late 1993 that the company expected and desired that Boyle would stay in office until reaching the retirement age of sixty-five.

At the same time, Boyle began to experience health problems. Testing revealed that he had an elevated white blood cell count. He began to wear glasses with one darkened lens because he suffered from double vision. Coworkers commented upon Boyle's unhealthy appearance.

On December 15, 1993, Boyle was diagnosed with myelodysplastic syndrome (MDS), a form of blood cancer. His doctor recommended a month of chemotherapy treatment. The timing was favorable for undergoing this treatment because of slow business during the holiday season. Boyle informed Gallagher Co. of his prognosis and made appropriate work assignments to assure smooth operations

during his absence.  He was treated over the course of thirty days, during which time he stayed in touch with the office and continued to make executive decisions and work assignments.

Boyle was released from the hospital on January 18, 1994, having lost all the hair on his head, his eyelashes and eyebrows, and twenty-five pounds.  He spoke with Gallagher on January 19 and gave an update on his condition.  Gallagher asked to speak to or meet with Boyle after a scheduled doctor's appointment on January 21.  Boyle's treating physician, Dr. Hagop M. Kantarjian, was not available on January 21 and Boyle saw a different doctor.  The visit with Dr. Kantarjian was rescheduled for January 25.  Boyle spoke to Gallagher after the January 21 visit and informed him that he would return to work on January 26.  Gallagher asked Boyle several questions about whether Boyle would be able to work a full day and how many hours he would be able to work.

On January 25, Dr. Kantarjian declared Boyle's cancer to be in "complete remission" and advised that he could return to work without limitation, other than six monthly three-to-five day chemotherapy sessions.  Upon his return to work at 9:00 a.m. on January 26, Boyle was immediately and aggressively confronted in his office by Gallagher, who demanded to know whether Boyle would be able to continue as president.  Boyle conveyed the information he had received from Dr. Kantarjian, but Gallagher was not satisfied; he wanted Boyle to guarantee that he could continue

-4-

serving as president of the company. Boyle responded that he and his doctors had reason to be optimistic, but that there was no way to guarantee that the cancer would not return. Gallagher expressed doubt that Boyle could continue to work after being treated for cancer, as well as concerns about the company's profitability under Boyle's leadership. He also demanded a report from Boyle's doctor. Boyle reiterated that he felt that he was able to work, that his doctors knew of no medical impediment to his doing so. He confirmed his intention to continue working until he reached the age of sixty-five. Boyle also stated that he would schedule his chemotherapy on weekends to minimize his time away from the office.

Gallagher suggested that Boyle should retire and alluded to his knowledge that Boyle had completely paid for his home and had over $600,000 in his retirement account. After Boyle reiterated his intention to keep working, Gallagher ended the meeting by demoting Boyle to the position of executive vice president and telling Boyle that his compensation would be reduced by half. Boyle expressed dissatisfaction with the reassignment, but said he would think about it. The next day, Gallagher issued a memorandum which stated that Boyle had been demoted to vice president of sales, an even lower position than the executive vice president position offered the previous day, and a lower position in the corporate hierarchy than any Boyle had occupied for the past

fifteen years. Boyle was humiliated and demoralized by this demotion.

Boyle entered the hospital again on January 28 for a scheduled chemotherapy treatment. He and Gallagher corresponded about Gallagher's decisions and Boyle's prognosis. On February 8, Boyle wrote to Gallagher and declined to accept the demotion and pay cut. Gallagher responded on February 10, once again accusing Boyle of poor performance and reiterating the importance of the president's position. Gallagher also claimed that he had been left in the dark about the "full ramifications" of Boyle's condition, and he stated his belief that Boyle's employment contract had expired on January 31, and that Boyle had rejected the company's offer of continued employment. Gallagher also noted that Boyle's medical coverage had been paid through the end of the month (February 1994). Boyle replied on February 16, enclosing a copy of Dr. Kantarjian's written statement of Boyle's prognosis. Boyle insisted that he had kept Gallagher Co. fully apprised of his condition, and that the automatic renewal provision in his contract had extended the contract for an additional year. Boyle ended his letter with a note of concern about his medical coverage, pointing out that he understood his employment contract to have pledged medical coverage for life. Gallagher replied on February 17, asserting that the "sparse information" provided by Dr. Kantarjian did not help his understanding of Boyle's condition. He stated, "What your doctor

does say is that you can return to work, but I have not seen you here."

Boyle never did return to the office. On April 21, 1994, Boyle filed a charge of discrimination with the Equal Employment Opportunity Commission.

The EEOC filed this suit, seeking injunctive relief for Boyle, based on its allegations that Gallagher Co. had violated the Americans with Disabilities Act (ADA) by constructively discharging Boyle and otherwise discriminating against him. Boyle intervened and alleged, among other things, that Gallagher Co. had breached his employment contract. The district court initially granted summary judgment in Boyle's favor. Then, in December 1994, Gallagher Co. filed suit against Boyle and others, alleging among other things that Boyle had breached his employment contract and his fiduciary duties by serving on the board of directors of Burch Biscuit Company. That action was removed to federal district court and consolidated with the action already pending there. Boyle added a claim of retaliation under the ADA, based on the lawsuit filed by Gallagher Co.

In April 1997, the district court reversed course and granted motions for summary judgment which had been filed by Gallagher Co. The court decided that its earlier ruling -- that Gallagher Co. had breached its employment contract with Boyle -- had been in error. *See **EEOC v. R.J. Gallagher Co.***, 959 F. Supp. 405, 409-10 (S.D. Tex.

1997).  The district court subsequently granted summary judgment in favor of Gallagher Co. on its counterclaims against Boyle, disposing of all remaining issues in the case.  The district court also awarded Gallagher Co. its attorneys' fees, to be collected from the Boyle estate[1] and the EEOC.

Both the EEOC and Boyle timely appeal from the summary judgment awarded in favor of Gallagher Co. on their claims against Gallagher Co., as well as the award of fees.

## II.

Boyle alleges that Gallagher Co. breached its employment contract with him when his salary was cut in half.  Gallagher Co. responds that Boyle's employment contract had expired, and, alternatively, that Boyle's preceding material breach excused Gallagher Co. from performance.

---

[1]    Michael Boyle died in January 1995, and his wife, Mary Boyle, was substituted as a party in her capacity as executrix of his estate.  For the sake of brevity and simplicity, hereinafter this opinion refers simply to "Boyle," although all legal actions after his death were obviously undertaken by Mary Boyle on behalf of the Michael Boyle estate, not by Michael Boyle himself.

**A.**

Section 3.1 of the "Executive Employment Agreement," as it originally provided effective February 1, 1989, established Boyle's salary as follows: "During the period of Employee's Executive Employment, Employer shall pay to Employee an annual salary herein called 'Base Salary' of $145,000.$^{00}$/$_{xx}$ per year in approximately equal monthly installments." The amount of salary was hand-written in a blank. When the Agreement was first revised and renewed effective February 1, 1990, the original salary amount was crossed out and revised to read "$205,000.$^{00}$/$_{xx}$." Section 1.2 of the Agreement, including its handwritten 1990 revision, reads as follows:

> Executive Employment. Employer employs Employee as a member of the Board of Directors of the R. J. Gallagher Company and as its Executive Vice President, and Employee accepts such employment, for a one year term beginning ~~December~~ February 1, 19~~89~~ 90. Said term is sometimes hereinafter referred to as the term of "Executive Employment." However, this Agreement shall automatically be renewed for consecutive one-year periods, unless either party gives notice to the other at least sixty (60) days prior to the termination date that said party does not intend to renew and extend this Agreement.

An "Extension and Amendment of Executive Employment Agreement" was executed on February 12, 1991, and it provided:

> Extension of agreement. Employer and Employee hereby agree to extend the term of the Executive Employee Agreement between Employer and Employee, dated February 1, 1990, for an additional three (3) years, commencing February 1, 1991, and expiring

> January 31, 1994. Employee shall continue to
> receive a base salary of $205,000.00 per year.

The district court concluded that "[d]emoting Boyle did not violate the contract because it was for a term and not a position." 959 F. Supp. at 409.[2]

Boyle contends that when Gallagher Co. failed to provide notice of its intention not to renew the Agreement sixty days before the expiration of the employment term on January 31, 1994, the contract automatically renewed for one year pursuant to section 1.2 of the Agreement. Gallagher Co. responds that the 1991 Extension and Amendment negated the automatic renewal provision of the original Agreement, replacing it with a three-year term with no automatic renewal. The company therefore contends that the contract expired on January 31, 1994, at which time Boyle became an at-will employee.

Texas law requires that we read a contract and its subsequent modifications as a whole, giving effect to new provisions and discarding old provisions which are inconsistent with the new terms. *See, e.g.,* **Boudreaux Civic Ass'n v. Cox**, 882 S.W.2d 543, 547-48 (Tex. App.--Houston [1st Dist.] 1994, no writ). Furthermore, we must interpret a contractual agreement so as to

---

[2] We are inclined to agree that the demotion did not constitute a breach. As the district court noted, the Agreement "was for a term and not a position. It had been signed when Boyle was vice-president." 959 F. Supp. at 409. Boyle does not press this point on appeal.

give effect to each and every provision of the contract. *See Westwood Exploration, Inc. v. Homestate Savings Ass'n*, 696 S.W.2d 378, 382 (Tex. 1985). The renewal provision was still part of the contract after Boyle and Gallagher Co. adopted the Extension and Amendment. The operative sentence, "However, this Agreement shall automatically be renewed for consecutive one-year periods, unless either party gives notice to the other at least sixty (60) days prior to the termination date that said party does not intend to renew and extend this Agreement," is not inconsistent with an initial three-year term. Whatever came before, the employment term "shall automatically be renewed . . . unless either party gives notice." The Extension and Agreement does not explicitly disavow automatic renewal, so the flaw of the interpretation suggested by Gallagher Co. is that it fails to give meaning to the still operative renewal terms. We therefore conclude that Gallagher's reduction of Boyle's salary was a material breach -- unless Boyle had already breached the contract, thereby excusing Gallagher Co. from performance.

**B.**

Gallagher Co. alleges that Boyle breached another provision of the Agreement -- that which required him to "[d]evote his full time and best efforts towards furthering the interest of Employer." If Boyle materially breached the Agreement first, Gallagher Co. was

-11-

excused from performance.  *See, e.g.,* **Hernandez v. Gulf Group Lloyds**, 875 S.W.2d 691, 692 (Tex. 1994).

Gallagher Co. points to Boyle's service on the board of directors of Burch Biscuit Company as being inconsistent with his duty to devote his best efforts to Gallagher Co.  Gallagher Co. also alleges that Boyle abused his executive privileges by submitting fraudulent reimbursement requests.

With respect to Boyle's involvement with Burch Biscuit, the evidence offered by Gallagher Co. shows that Boyle spent "some of his time" attending meetings, and received $10,000 in annual salary.  Gallagher Co. asserts that if Boyle spent some time, *i.e.*, any time at all, working for Burch Biscuit, that work is inconsistent with devotion of "full time and best efforts" to Gallagher Co. and therefore constitutes a breach.  We disagree. The evidence shows that Boyle's duties and actual performance were limited to attendance at one annual board meeting.  "Full time and best efforts" obviously does not mean that Boyle had to devote twenty-four hours a day, or even every waking hour, to advancing the interests of Gallagher Co.[3]  A weekend family vacation would

---

[3]     *See* **Transamerica Ins. Co. v. Frost Nat'l Bank***,* 501 S.W.2d 418, 423-24 (Tex. Civ. App.--Beaumont 1973, writ ref'd n.r.e.) (quoting with approval **Long v. Forbes**, 136 P.2d 242, 246 (Wyo. 1943) ("The cases seem to hold that full-time employment does not mean that the employee may not have some time that he may use in his personal affairs, or in other business, without breach of the employment contract.")).

not be inconsistent with working "full time" for Gallagher Co., and neither was attending one Burch Biscuit board meeting a year. "Best efforts" means "such efforts as are reasonable in the light of that party's ability and the means at its disposal and of the other party's justifiable expectations."[4] Burch Biscuit does not compete with Gallagher Co., and therefore Boyle's assistance to Burch Biscuit was not inconsistent with providing "best efforts" on behalf of Gallagher Co. We thus conclude that the mere fact of Boyle's status as a director of Burch Biscuit did not constitute breach of a "full time and best efforts" clause.

With respect to Gallagher Co.'s allegations that Boyle misappropriated its funds by submitting improper reimbursement requests, Gallagher Co. relies on evidence that Boyle requested reimbursement for business meals and entertainment that either never took place or that Boyle did not pay for. These charges are supported by the statements of individuals listed on Boyle's reports as those whom he had entertained. Gallagher Co. contends that the filing of false expense reports was inconsistent with the fiduciary duties owed to it by Boyle. In response, Boyle swore that he did not submit false reports, specifically denying each of the charges of Gallagher Co. This is a swearing match -- a factual

_____

[4]     E. Allan Farnsworth, *Contracts* § 7.17, at 553 (2d ed. 1990).

dispute which must be resolved by the ultimate fact finder, not by the judge on summary judgment.

In sum, by submitting false expense reports Boyle may have breached his employment contract before Gallagher Co. did. For the time being, however, that is a question of disputed material fact. The question of whether Gallagher Co. committed an actionable breach depends on the resolution of this dispute, and that question therefore cannot be resolved on summary judgment.


**III.**

The district court concluded that Boyle was not covered by the ADA because he did not have a "disability" as that term is understood under the statute. For the purposes of the ADA, an individual has a "disability" if he has "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," if he has "a record of such an impairment," or if he is "being regarded as having such an impairment." 42 U.S.C. § 12102(2).

We review the district court's determination on summary judgment de novo, applying the same standards as does the district court. *See, e.g.*, ***Chaney v. New Orleans Pub. Facility Management, Inc.,*** No. 98-30063, 1999 WL 402551, at *2 (5th Cir. June 17, 1999). We shall consider each category of ADA "disability" in turn.

**A.**

The district determined that Boyle was not disabled by employing the following analysis:

> The analysis under the act poses these questions:
>
> - Can you walk, see, hear, speak, breathe, lift, learn, etc? (objective function)
>
> - Despite the combination of these inabilities, are you substantially unrestricted in your ability to work and take care of yourself? (abstract function)
>
> - Is the objective function essential to the job? (qualification)
>
> - Is more than a reasonable accommodation needed for you to be able to be at work to do the job? (accommodation)
>
> - Is there a plausible explanation for the job action? (contradiction of inference of irrational reaction--"reactive distaste")
>
> An answer of "yes" to any one of these questions defeats a claim. For Boyle, no matter which questions are assumed to be "no," the record shows a "yes" answer to another one.

959 F. Supp. at 405.

The EEOC and Boyle contend that this test is not grounded in statutory or common-law authority, and it fails to consider the effect of Boyle's cancer in its unmitigated state.

We reject the five-part test employed by the district court, mainly because it unnecessarily complicates matters. The plain text of the ADA prescribes three marks of a "disability" under

-15-

§ 12102(2)(A): (1) impairment (2) affecting a major life activity and (3) resulting in substantial limitation of that major life activity. The Supreme Court demonstrated the application of this test in *Bragdon v. Abbott*, 524 U.S. 624, 118 S. Ct. 2196 (1998), and we follow that example.

### 1.

We do not doubt that Boyle's affliction with MDS qualifies as a physical impairment under § 12102(2). The affidavit of Boyle's treating physician, Dr. Kantarjian, describes MDS as "a disorder or condition of the blood and bone marrow that primarily effects [*sic*] the hematopietic system, and may infiltrate other body systems, such as the neurologic system." Without treatment, Boyle's condition would have resulted in "severe anemia, systemic infection, internal bleeding" and would "infiltrate other organs or body systems." As Gallagher Co. concedes that MDS is a qualifying impairment, we need not further explore whether MDS is an impairment.

### 2.

Next, we consider whether Boyle's MDS affected a major life activity. As a threshold matter, the EEOC and Boyle have argued that Boyle's condition should be analyzed without consideration of the mitigating influence of medical treatment. Thus, we would

assume that Boyle was suffering from "severe anemia, systemic infection, internal bleeding" and that his MDS would "infiltrate other organs or body systems."  As a result, in Dr. Kantarjian's words, Boyle would be "bed ridden and unable to perform the ordinary activities of his life, such as caring for himself, walking, seeing, working, or other major life activities."

We do not doubt that Boyle's condition, if left untreated, would affect the full panorama of life activities, and indeed would likely result in an untimely death.  Use of the predicted effects of the impairment in its untreated state for the purposes of considering whether a major life activity has been affected by a physical or mental impairment has, however, been foreclosed by the recent opinion of the Supreme Court in **Sutton v. United Air Lines, Inc.**, 67 U.S.L.W. 4537 (U.S. June 22, 1999).  The Court made clear that § 12102(2)(A) requires "that a person be presently -- not potentially or hypothetically -- substantially limited."  **Sutton**, 67 U.S.L.W. at 4540; *see also* **HCA Health Servs. v. Washington**, 67 U.S.L.W. 3783 (U.S. June 24, 1999), *vacating* 152 F.3d 464 (5th Cir. 1998); **Murphy v. United Parcel Serv., Inc.**, 67 U.S.L.W. 4549, 4550 (U.S. June 22, 1999); **Albertsons, Inc. v. Kirkingburg**, 67 U.S.L.W. 4560, 4563 (U.S. June 22, 1999).  "A person whose physical or mental impairment is corrected by medication or other measures does

-17-

not have an impairment that presently 'substantially limits' a major life activity."  *Sutton*, 67 U.S.L.W. at 4540.

We must consider the actual effects of Boyle's impairment and the side effects of his treatment.  That being the case, the only major life activity which the EEOC and Boyle have alleged to have been affected by that impairment was Boyle's ability to work.  Although Boyle could carry out the duties of his job, the fact that he had to receive monthly chemotherapy treatments lasting three to five days meant that he would have to be away from the job for one to three days of an ordinary work week each month.

Just as the *Bragdon* Court did with respect to reproduction, we conclude based on the plain text of the ADA that working is a covered "major life activity."[5]  The Court in *Bragdon* explained

---

[5]  Our Court has routinely echoed the guidance of the EEOC's interpretive guidelines concerning which activities constitute "major life activities."  The EEOC's list includes "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."  29 C.F.R. § 1630.2(i), *cited in* ***Zenor v. El Paso Healthcare Sys., Ltd.***, 176 F.3d 847, ___ n.8 (5th Cir. 1999); ***Gonzales v. City of New Braunfels, Tex. ex rel. New Braunfels Police Dep't***, 176 F.3d 834, ___ (5th Cir. 1999); ***Talk v. Delta Airlines, Inc.***, 165 F.3d 1021, 1024-25 (5th Cir. 1999) (summary calendar); ***Pryor v. Trane Co.***, 138 F.3d 1024, 1026 & n.10 (5th Cir. 1998) (summary calendar); ***Hamilton v. Southwestern Bell Tel. Co.***, 136 F.3d 1047, 1050 n.8 (5th Cir. 1998); ***Sherrod v. American Airlines, Inc.***, 132 F.3d 1112, 1119 (5th Cir. 1998); ***Still v. Freeport-McMoran, Inc.***, 120 F.3d 50, 52 (5th Cir. 1997); ***Robinson v. Global Marine Drilling Co.***, 101 F.3d 35, 36 (5th Cir. 1996); ***Riel v. Electronic Data Sys. Corp.***, 99 F.3d 678, 682 (5th Cir. 1996); ***Bridges v. City of Bossier***, 92 F.3d 329, 332 (5th Cir. 1996); ***Rogers v. International Marine Terminals, Inc.***, 87 F.3d 755, 758 n.2 (5th Cir. 1996); ***Ray v. Glidden Co.***, 85 F.3d 227,

that "'[t]he plain meaning of the word "major" denotes comparative importance' and 'suggest[s] that the touchstone for determining an activity's inclusion under the statutory rubric is its significance.'" *Bragdon*, 118 S. Ct. at 2205 (quoting *Abbott v. Bragdon*, 107 F.3d 934, 939, 940 (1st Cir. 1997), *aff'd*, 524 U.S. 624, 118 S. Ct. 2196 (1998), alterations in original). Working falls well within the phrase "major life activity." For many, working is necessary for self-sustenance or to support an entire family. The choice of an occupation often provides the opportunity for self-expression and for contribution to productive society. Importantly, most jobs involve some degree of social interaction, both with coworkers and with the public at large, providing opportunities for collegial collaboration and friendship. For those of us who are able to work and choose to work, our jobs are an important element of how we define ourselves and how we are perceived by others. The inability to access the many

229 (5th Cir. 1996) (summary calendar); *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 190 (5th Cir. 1996); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (summary calendar).

The Supreme Court's recent observance that "[n]o agency . . . has been given authority to issue regulations implementing the generally applicable provisions of the ADA" now casts a shadow of doubt over the validity and authority of the EEOC's regulations. *Sutton*, 67 U.S.L.W. at 4539. However, because we conclude, based on the plain text of the ADA, that working is indeed a major life activity, we need not decide whether the EEOC's regulations are due any deference, or whether we are bound by our own precedent to respect them.

opportunities afforded by working constitutes exclusion from many of the significant experiences of life.  Without doubt, then, working is a major life activity.

**3.**

Finally, we consider whether Boyle's MDS impairment resulted in a substantial limitation of his major life activity of working. We conclude that it did not.  At the time Boyle returned to the office and was confronted by Gallagher, his cancer had gone into complete remission and his doctors had cleared him for an unqualified return to work.  This necessarily implies that the doctors believed that Boyle's major life activities were largely unaffected by the physical impairment of MDS.  The district court observed that the only actual present limitation claimed by Boyle was his need to return to the hospital for six monthly chemotherapy treatments.  Boyle insisted to his former employer, and both the EEOC and Boyle have argued on appeal, that he could follow this treatment schedule and still maintain his full workload.  We have no doubt that this is so, especially given the flexibility most executives have in scheduling professional obligations.  He could still access his job and all of its accoutrements: salary and benefits; personal and professional opportunities; and social interaction with his colleagues.  As a result, Boyle did not suffer

from a substantial limitation necessary to invoke "disability" status under § 12102(2)(A).

## B.

The second possible way of establishing "disability" is to prove a record of impairment which substantially limited a major life activity. The differences between the present effect of Boyle's impairment at the time he left Gallagher Co. (for § 12102(2)(A)) and the record of that impairment's effect (for § 12102(2)(B)) are: a pre-diagnosis effect on Boyle's vision due to cancer-related nerve palsy; a thirty-day hospitalization to complete his initial round of treatment, which prevented Boyle from caring for himself; and isolation from other persons due to Boyle's weakened immune system, which affected his ability to work.

The EEOC relies on its interpretative regulation, 29 C.F.R. § 1630.2, for its position that the ADA "protects former cancer patients from discrimination on the basis of their prior medical history." This broad position obviously cannot be the rule in the wake of *Sutton*, which emphasizes both the ADA's requirement of individualized inquiry and a focus on the actual effects of the impairment. In other words, it is not enough for an ADA plaintiff to simply show that he has a record of a cancer diagnosis; in order to establish the existence of a "disability" under § 12102(2)(B),

-21-

there must be a record of an impairment that substantially limits one or more of the ADA plaintiff's major life activities.

The EEOC and Boyle also contend that Boyle had a record of substantial limitation on major life activities beginning around the time he was diagnosed with MDS and lasting until he completed his initial course of treatment and the cancer went into remission. The district court did not specifically confront this allegation; it merely asserted that Boyle could not satisfy the five-part test posed by the court. *See* 959 F. Supp. at 409. This assertion by the district court does not support summary judgment in favor of the employer. Consider, for example, the first question posed by the district court: "Can you walk, see, hear, speak, breathe, lift, learn, etc?" The district court believed that a "yes" answer to this question would defeat any claim under the ADA. *See* **id**. But an affirmative response simply does not preclude the possibility that a major life activity was substantially affected. It is possible that during his thirty-day stay at the hospital, Boyle could walk, see, hear, speak, breathe, lift, and learn, and yet his ability to work might still have been substantially affected. Boyle's limited vision might have caused a substantial limitation of major life activities. His long hospital stay and his isolation from others, results of the treatment Boyle undertook to treat his impairment, may also be considered as the cause of such limitations. *See* **Sutton**, 67 U.S.L.W. at 4540 (suggesting that

-22-

"negative side effects suffered by an individual resulting from the use of mitigating measures" are an appropriate component of the individualized approach mandated by the ADA). We need not speculate as to what major life activities may have been affected; that is an issue ripe for fresh consideration before the district court. All we decide is that the district court's analysis does not resolve the matter. On remand, the district court should follow the example of **Bragdon v. Abbott** to determine whether the record of Boyle's impairment includes a substantial effect on a major life activity.

## C.

The final possible basis for ADA liability is Boyle's allegation that Gallagher Co. discriminated against Boyle based on a perception of disability. The district court resolved this issue by reasoning as follows:

> Assuming that Gallagher perceived Boyle as ill, that is not a perception of disability. The "or perceived" language is in the law to protect people who have some obvious specific handicap that employers might generalize into a disability. Boyle did not have a condition -- a defect -- that Gallagher, based on erroneous social stereotypes, could generalize into an inability to function on the job.

959 F. Supp. at 409. At the summary judgment hearing, the district court elaborated on this novel view by stating that the application

of the "regarded as" prong is exemplified by cases involving "people with one arm" or those who "show up wearing an eye patch."

This analysis is off the mark. The text of the ADA could not be clearer on this point. The protection for individuals "regarded as" being disabled is for individuals who are "regarded as" having "such an impairment," 42 U.S.C. § 12102(2)(C). "Such" an impairment means the same kind of impairment as would give rise to protection if it actually existed, that is, one that "substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A). *See* **Sutton**, 67 U.S.L.W. at 4541. One does not have to have "some obvious specific handicap" in order to fall into this category. As the Supreme Court explained,

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual--it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

**Sutton**, 67 U.S.L.W. at 4541-42; *see also* **Murphy**, 67 U.S.L.W. at 4550-51.

Not surprisingly, Gallagher Co. takes a different tack and relies on the fact that Boyle was offered the position of vice president of sales as evidence that he was not regarded as being unable to perform. Our precedents do suggest that the employer's offer of another position in the same class of occupations may disprove an allegation of discrimination based on perception of disability. *See, e.g.*, **Bridges v. City of Bossier**, 92 F.3d 329, 334-36 (5th Cir. 1996). Boyle's claims are distinguishable from that line of cases; a jury could conclude, based upon the summary judgment evidence, that Boyle was constructively discharged when Gallagher Co. reduced his salary by half. If that is the case, it makes no difference that Gallagher Co. has a legal fig leaf to hide behind. If the offer of the vice president for sales position, tied to a fifty-percent reduction in salary, was designed to force Boyle to resign because Gallagher regarded Boyle as disabled and incapable of performing his job, the presumption that Boyle was not regarded as disabled dissolves. Such a pretextual offer cannot shield the employer from ADA liability for its discriminatory actions.

Based on Boyle's factual allegations about Gallagher's conduct, we conclude that there is a genuine issue of material fact as to whether Boyle was regarded as disabled, and therefore summary judgment was inappropriate.

**IV.**

Boyle also appeals the summary judgment entered in favor of Gallagher Co. on his retaliation claims under the ADA. The district court correctly ruled that the filing of a lawsuit cannot be an "adverse employment action" such as required to trigger the ADA's protection against retaliation under 42 U.S.C. § 12203, because it is not an employment action at all. *See* 959 F. Supp. at 410. We affirm this aspect of the judgment below.

**V.**

For the foregoing reasons, the judgment of the district court is AFFIRMED in part, and VACATED in part, and we REMAND for further proceedings consistent with this opinion.[6]

---

[6] Because of our disposition on the merits of the case, we also must vacate the district court's fee award. We express no opinion regarding whether fees were properly assessed based on the district court's judgment on the merits.