**EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, et al., Plaintiffs,**

**v.**

**WOODBRIDGE CORPORATION, Defendant.**

**No. 99–0370–CV–W–4–ECF.**

United States District Court,
W.D. Missouri,
Western Division.

Oct. 2, 2000.

Barbara A. Seely, Equal Employment Opportunity Commission, St. Louis, MO, Jerry L. Short, U.S. Attorney's Office, Kansas City, MO, for plaintiff.

Rowdy B. Meeks, Sonnenschein Nath & Rosenthal, Kansas City, MO, for defendant.

## ORDER

FENNER, District Judge.

Presently before the Court is the Defendant, Woodbridge Corporation ("Woodbridge")'s Motion for Summary Judgment against the Plaintiff, The Equal Employment Opportunity Commission ("EEOC") (Doc. # 73). Also under consideration at this time by the Court is Woodbridge's Motion for Summary Judgment against the Complaint filed by the Intervener Delores Anderson ("Anderson") (Doc. # 70). The EEOC brings this suit under the Americans with Disabilities Act ("ADA") on behalf of 19 job applicants at the Defendant's factory, including intervener Anderson. The EEOC claims that Anderson and other co-applicants were denied promotion due to perceived disabilities in violation of the ADA. For the reasons set forth below the Court hereby GRANTS both Motions brought by the Defendant.

## DISCUSSION

### I. Standards

Rule 56(c), Federal Rules of Civil Procedure, provides that summary judgment shall be rendered if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, it is the court's obligation to view the facts in the light most favorable to the adverse party and to allow the adverse party the benefit of all reasonable inferences to be drawn from the evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Inland Oil and Transport Co. v. United States*, 600 F.2d 725, 727–28 (8th Cir.), *cert. denied*, 444 U.S. 991, 100 S.Ct. 522, 62 L.Ed.2d 420, (1979). In this case the adverse party to the motion for summary judgment is the Plaintiff.

If there is no genuine issue about any material fact, summary judgment is proper because it avoids needless and costly litigation and promotes judicial efficiency. *Roberts v. Browning*, 610 F.2d 528, 531 (8th Cir.1979); *United States v. Porter*, 581 F.2d 698, 703 (8th Cir.1978). The summary judgment procedure is not a "disfavored procedural shortcut." Rather, it is "an integral part of the Federal Rules as a whole." *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986); *see also City of Mt. Pleasant v. Associated Electric Cooperative, Inc.*, 838 F.2d 268, 273 (8th Cir.1988). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish that there is a genuine issue for trial about an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 106 S.Ct. at 2553.

The moving party bears the initial burden of demonstrating by reference to portions of pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, the absence of genuine issues of material fact. However, the moving party is not required to

support its motion with affidavits or other similar materials negating the opponent's claim. *Id.*

The nonmoving party is then required to go beyond the pleadings and by affidavits, depositions, answers to interrogatories and admissions on file, designate specific facts showing that there is a genuine issue for trial. *Id.* A party opposing a properly supported motion for summary judgment cannot simply rest on allegations and denials in his pleading to get to a jury without any significant probative evidence tending to support the complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The evidence favoring the nonmoving party must be more than "merely colorable." *Id.* at 2511. When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (footnote omitted).

The inquiry to be made mirrors the standard for a directed verdict: whether the evidence presented by the party with the onus of proof is sufficient that a jury could properly proceed to return a verdict for that party. *Anderson v. Liberty Lobby*, 106 S.Ct. at 2511. Essentially, the question in ruling on a motion for summary judgment and on a motion for directed verdict is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Id.* at 2512.

## II. Facts

Woodbridge is a Missouri corporation producing polyurethane foam pads used in automobile seat covers. Woodbridge employs approximately 160 workers at its Riverside, Missouri plant and is the only foam producing plant in the metropolitan area. The production area of the plant is fast paced and requires repetitive hand and wrist motions while working at the assembly line which moves at approximately 50 feet per minute. These jobs include repetitively placing metal frames on the line for hot polyurethane pouring, removing the molds, cleaning and scrubbing. These positions are known as online production employees because they work directly on the line. Off the line are inspection and repair workers who repetitively repair and pack the molds using knives, foam saws, and glue guns. Collectively these jobs are known as production or manufacturing jobs.

At all relevant times Defendant utilized the medical services of an occupational health clinic ("Clinic"), who conducted the Defendant's post hire/pre-employment physical screening. In 1994 the Clinic, at Defendant's request, developed a specific physical examination program to determine whether individual applicants were suitable for the rigorous demands of the Woodbridge factory. This Woodbridge specific examination was designed to minimize the risks associated with pain and upper extremities problems which had frequently been reported from Woodbridge employees. There were concerns among Woodbridge management of increased problems with Carpal Tunnel Syndrome ("CTS"), because of the repetitive motion of the production positions. Woodbridge apparently wanted to develop a screening program which could identify applicants with CTS or with a high likelihood of developing it. This concern for workers developing CTS arose from OSHA safety concerns and increased cost concerns.

The physicians designing the exam visited the plant and observed the operations and the potential physical difficulties in working there. Among other tests which the physicians implemented in their physical screening was a neurometry test. This test, while not 100% accurate, was utilized

as a screening device to determine if applicants either had, or were at significantly increased risks of developing, CTS. If the applicant scored at a certain level on the neurometry test then the physicians reported possible median nerve impairment and recommended that the applicant be rejected for production work at Woodbridge.

All of the 19 applicants represented by the EEOC in this suit accepted positions as manufacturers at Woodbridge and subsequently had those offers revoked because their neurometry reports were abnormal. The record reflects that Woodbridge consistently refused to place any applicant into an hourly production position with an abnormal neurometry score. The record also reflects that the Defendant hired persons regardless of an abnormal neurometry readings for other positions within the company including electricians, tool technicians, secretaries, and white collar positions. There is no evidence which indicates that any decision maker ever formulated an opinion as to whether these rejected applicants were qualified for repetitious positions outside of the Woodbridge company.

## III. Analysis

### A. Disability Under the ADA

In order to state a cause of action under the ADA, a plaintiff must show that an employer discriminated "against a qualified individual with a disability because of the disability of the individual." 42 U.S.C. § 12112(a). In the present Motion, the sole dispute between the parties is whether the applicants in question had a disability as defined in the ADA. The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having an impairment." 42 U.S.C. § 12102(2).

In the present case the EEOC claims only that the applicants in question were disabled under section C in that they were regarded by Woodbridge as disabled.[1] The parties seem to be in agreement that the applicants' actual alleged condition of CTS is not itself a "disability" as defined in the ADA. *See e.g., Gutridge v. Clure,* 153 F.3d 898, 901 (8th Cir.1998). However, as discussed below, the erroneous perception of an impairment can be a disability in-and-of-itself under Section C of the ADA.

To be regarded as disabled the applicants in question must be thought of by Woodbridge as having an impairment which significantly limits a major life activity. *EEOC v. R.J. Gallagher Co.,* 181 F.3d 645, 656 (5th Cir.1999). Major life activities include caring for one's self, sitting, standing, lifting, reaching, walking, performing manual tasks, hearing, seeing, breathing, learning, and working. *Fjellestad v. Pizza Hut of America, Inc.,* 188 F.3d 944, 948 (8th Cir.1999). An impairment is considered to be substantially limiting if it

> renders an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner, or duration under which an individual can perform a particular major life activity as compared to an average person in the general population.

*Id.* In determining whether a person is substantially limited in a major life activity a court should consider the nature and severity of the impairment, its anticipated duration, and its long-term impact. *Id.* This determination must be individualized and made on a case by case basis. *Doane v. City of Omaha,* 115 F.3d 624, 627 (8th Cir.1997).

More specifically, the United States Supreme Court has recently announced a test of sorts for determining

---

1. Intervener Anderson also claims that she had a record of an impairment under Section B. This claim will be discussed separately below in Part B.

whether an individual is regarded as disabled under the ADA. *See Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). To make a case for discrimination under Section C of the ADA a plaintiff must show that; (1) the employer mistakenly believed that the applicants had an impairment that substantially limited a major life activity, or (2) the employer mistakenly believed that an actual, non-limiting impairment substantially limits a major life activity. *Id.* at 2149–50. In this case, the EEOC argues the first of these prongs. Plaintiff contends that Woodbridge mistakenly believed that the applicants were substantially limited in the major life activity of working because Woodbridge mistakenly believed that the applicants either had CTS or were at increased risks of developing it.

In order for an employer to have violated Section (C) of the ADA it is not enough that the employer simply regarded the person as disabled; i.e. "I believe this employee is disabled." Rather, the employer must regard the employee as disabled as defined in the statute. *See Murphy v. United Parcel Serv.,* 527 U.S. 516, 119 S.Ct. 2133, 2138, 144 L.Ed.2d 484 (1999). In other words, in order for the Defendant to have regarded the applicants as disabled from the major life activity of working, the Defendant must have regarded the Plaintiff as being "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities." *Id.* "[T]o be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Id.*

The application of the facts of this case to the above stated rule depends in part on the interpretation of this very language. The Defendant only considered the applicants for one type of position, production line workers. So in the strictest sense it is difficult to determine whether the Defendant regarded the applicants as significantly restricted from a broad range or class of positions. However, if courts were to adopt this view then every employer sued under the ADA would simply argue that they only regarded the employee as restricted from performing the particular job for which they were considered. This would eviscerate the purpose behind the "regarded as" prong of the ADA. Therefore, it is this Court's judgment that a court must look to the rationale behind the employer's conclusion that a prospective employee is significantly restricted from performing a specific job.

In a recent unpublished summary judgment opinion this Court faced this very same issue. In *Rule v. Missouri Gaming Co.,* No. 99–0554 (W.D.Mo. filed December 13, 1999), the defendant moved for summary judgment in a case brought by the plaintiff alleging that the defendant did not hire plaintiff as a security guard because of his diabetic condition. The defendant did not feel that a person with diabetes could perform the essential duties of the position which included; "providing security, handling problem situations, patrolling, over seeing boarding, checking IDs, providing crowd control, and helping with emergency situations." *Id.* at 9. The Court held that these perceptions, if based in reality, would severely limit the plaintiff's ability to engage in a broad range of positions. *Id.* at 8–9. This Court stated:

Not being able to perform simple tasks such as "patrolling" which generally involves only walking, or checking IDs which involves seeing, would generally prohibit the Plaintiff from a broad range of positions. The Defendant's perception of the Plaintiff would at least prevent him from obtaining positions as any type of security personnel and perhaps an even broader class of positions involving any type of physical exertion or safety responsibility (cab driver, teacher, police person, air traffic controller?). In short, the Defendant's percep-

tion of the Plaintiff's condition, if true, would significantly restrict the Plaintiff's qualifications for a broad range of positions. Considering the evidence in a light most favorable to the Plaintiff, the Defendant regarded the Plaintiff as disabled.

*Id.* at 9. This Court continues to find this rationale sound, but it finds the case at bar distinguishable from the *Rule* case.

In *Rule,* the defendant did not hire the plaintiff because it felt that plaintiff was not able to sufficiently walk, stand, or see which were essential job functions. If indeed a person could not walk, stand or see then certainly they would be disabled under the ADA. Despite the fact that the plaintiff in *Rule* was only being considered for one specific position, the reasons he was not given that position (his inability to sufficiently see, stand, and walk) rendered him "disabled" in the eyes of his employer. *See Taylor v. Pathmark Stores, Inc.,* 177 F.3d 180, 188 (3rd Cir.1999). Because the *Rule* defendant perceived the plaintiff in this light, the Court found that the plaintiff was disabled under Section C.

■ In the present case, Woodbridge has indicated no similar broad perceptions of the applicants in question. Defendant considered the applicants for very specific jobs (production worker), and determined that their medical condition (CTS or increased risk for CTS), made them unqualified for the position. The record reflects that the Defendant believed the applicants were generally employable, and indeed qualified for other positions at the Woodbridge plant; just not manufacturing positions. The record also clearly reflects that the Defendant's perception of the applicants, whether justified or not, was that they did not consider the applicants qualified for the repetitive motion positions at the Woodbridge plant. While repetitive motion positions can encompass a wide variety of positions, thus raising the Court's suspicions, in this case the Defendant's perceptions were narrow. The applicant's were simply not qualified

to perform the high speed and strenuous assembly line and inspection work requiring extremely high volume repetitive motion which was found at the Woodbridge plant. Even construing the evidence in a light most favorable to the Plaintiff, the record does not reflect that the Defendant's perception of the applicant's abilities would prohibit the applicant's from a broad range or class of positions.

This conclusion is also consistent with, and supported by, the two major United States Supreme Court cases cited by both parties. For instance, in *Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Court faced the issue of whether an employer/airline regarded an employee/pilot as disabled because the airline refused to hire pilots with severe myopia for global pilot positions. The Court rejected the notion that the airline had regarded the myopic pilots as unable to perform a "class of employment." *Id.* at 2150. Rather, like the unique Woodbridge manufacturing positions, the Court held that the position of global airline pilot was a single job, and thus the airline did not regard the pilots as having a substantially limiting impairment. *Id.* at 2151. Also similar to the Woodbridge applicants, the *Sutton* Court noted that even under the airline's restrictive assumptions concerning the myopic pilots, a wide range of positions were still available to them. *Id.* These positions even include other piloting positions such as regional pilot, pilot instructors, co-pilot, or courier pilot. *Id.*

This Court is following the same rationale that the Supreme Court did in *Sutton.* The record is clear that the only positions for which Woodbridge considered the applicants unqualified to perform due to their perceived risks of CTS was that of manufacturing positions at the Woodbridge plant. That perception, if based in reality, would not prevent the applicants from gaining employment in a wide variety of employment, including other manufacturing positions. More specifically, the

applicants could still be qualified for manufacturing positions involving repetitive motions. The Defendant's only documented perception of the applicants is that they were not physically qualified to perform the unique requirements of the Woodbridge manufacturing positions. This perception does not prevent the applicants from obtaining employment in a broad class of jobs. Therefore, it is not a disability.

Similarly, in *Murphy v. United Parcel Serv., Inc.,* 527 U.S. 516, 119 S.Ct. 2133, 144 L.Ed.2d 484 (1999), the Supreme Court faced the issue of whether a defendant/employer regarded an employee/mechanic as disabled under the ADA when it refused to hire a mechanic with high blood pressure. Under DOT guidelines, mechanics who work on commercial vehicles were required to be certified. Persons with high blood pressure were not able to obtain such a certification and thus, the defendant refused to hire the mechanic in question. *Id.* at 2138. As to whether the employer had regarded the plaintiff as having a disability, the Court stated,

> [t]he evidence that petitioner is regarded as unable to meet the DOT regulations is not sufficient to create a genuine issue of material fact as to whether petitioner is regarded as unable to perform a class of jobs utilizing his skills. At most, petitioner has shown that he is regarded as unable to perform the job of mechanic only when that job requires driving a commercial motor vehicle—a specific type of vehicle used on a highway in interstate commerce.

*Id.* Furthermore, the Court found that even under the employer's restrictive view of the hypertensive mechanic, he was still qualified for a wide variety of employment including almost any other type of mechanic's position. *Id.* The Court ultimately held that the mechanic's inability to qualify for one specific type of position could not rise to the level of a disability because an employer who only regards an employee as unable to perform one particular job does not regard the employee as disabled. *Id.* at 2139.

Once again, in the present case the Plaintiff has failed to demonstrate that Woodbridge regarded the applicants as unable to perform a class or wide array of employment. Rather, the clear record is that the Defendant only regarded the applicants as unable to perform the positions of Woodbridge manufacturing positions. Furthermore, it is also clear that even under Defendant's restrictive view of the applicants, the applicants were still qualified for a broad class of jobs including those involving repetitive motion. The Plaintiff has failed to produce any evidence that the Defendant regarded the applicants as unable to perform any other repetitive motion jobs other than that of the unique and intensive manufacturing positions at Woodbridge. Finally, the Defendant, as the defendant in *Murphy,* has produced evidence that the applicants were capable of obtaining and performing a wide variety of employment positions. *See id.* at 2139.

When comparing the present case with the results of the *Rule, Sutton,* and *Murphy* cases, it is clear that this case must be dismissed. First, in all four of these cases the employers only actually considered the applicants for one particular position or a narrow range of jobs. However, extending the necessary inquiry into the implications of the employers' perceptions, the comparisons and contrasts between the cases become clear. In *Sutton, Murphy,* and the present case, the employers' perceptions of the applicants, whether based in reality or not, would not prevent the applicants from obtaining employment in a broad class of jobs. Even assuming the employers' perceptions to be true, the applicants were still generally employable in numerous and broad classes of jobs.

Contrast that with this Court's decision in *Rule.* In *Rule,* this Court concluded that the employer's perception of the applicant—that he could not perform simple employment tasks such as walking and

seeing—would preclude the employee from obtaining a very broad class of employment positions. The employer certainly perceived the applicant as disabled because its perception of the employee would prevent the applicant from obtaining numerous positions that might require walking and seeing. Woodbridge held no such broad perceptions of the applicants in this suit. In fact, Woodbridge argues consistently that the applicants are generally employable, including non-manufacturing jobs at their plant. In sum, the facts of this case, applied to binding precedent, require this Court to dismiss the Plaintiff's (and Intervener's) case as to prong C of the ADA.

### B. Record of Impairment

■ The Intervener to this suit, Anderson, has also made a claim under prong B of the ADA by claiming that she had a disability as defined in the ADA because Woodbridge had a record of an impairment to a major life activity. She thus claims that she was denied employment because of a disability in violation of the ADA. For reasons similar to her "regarded as" claim, this claim must also fail.

A person can be considered to be disabled under the ADA if the person is said to have "a record of such an impairment." 42 U.S.C. § 12102. In this cases, Anderson claims that Woodbridge had a record of an impairment because one of the Clinic physicians, Dr. Foster, sent Woodbridge a letter stating in relevant part that "it is my professional opinion that any repetitive motion would put this patient at increased risk for further deterioration of her problems referable to her wrists." Anderson claims that this statement creates a record of an impairment because if it were true it would prevent her from obtaining employment in a wide variety of positions. There are several problems with this argument.

■ First, the record is undisputed that the Clinic created the testing procedures exclusively for Woodbridge, and only evaluated applicants for positions at the Woodbridge plant. Therefore, Dr. Foster's statement must be viewed in that context and not the sweeping interpretation Anderson would have the Court adopt. Second, simply stating that someone is at an increased risk of developing an impairment which arguably removes Anderson from consideration in a broad category of jobs is not the same as saying the person is unqualified. The Doctor simply states that she is increasing her risk of CTS, not that she cannot perform the position. Third, CTS is usually not considered a disability under the ADA. Therefore, even if Anderson was "misclassified" as having CTS as she argues, it is of little consequence. Finally, an employer is allowed to reasonably rely on a doctor's assessment of an employee's abilities as long as the employer does not perceive the employee as disabled. *Gerdes v. Swift–Eckrich, Inc.,* 125 F.3d 634, 637–38 (8th Cir.1997). The record does not reflect any perception by Woodbridge that Anderson was disabled; i.e. that she was unable to perform a broad class or range of jobs. Therefore, Anderson has failed in her burden of demonstrating that she had a record of impairment.

### CONCLUSION

For the foregoing reasons the Court holds that the applicants at issue in this suit are not "disabled" as defined in Sections B or C of 42 U.S.C. § 12102(2). The Court hereby GRANTS the Defendant's Motion for Summary Judgment as to the claims brought by the EEOC and by the Intervener Anderson. This case is dismissed with prejudice to future actions.[2]

**IT IS SO ORDERED**

2. Two motions remain outstanding; Plaintiff's     Motion to File a Surreply Brief (Doc. # 97)

and Defendant's Opposition to that Motion and a related Motion to Strike the filed Surreply Brief (Doc # 101). For purposes of the record, the Plaintiff's Motion to File a Surreply Brief is GRANTED and the Defendant's Opposition and Motion to Strike are DENIED.