**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**February 26, 2004**

**Charles R. Fulbruge III**
**Clerk**

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 03-50656

DICK W ARRINGTON

Plaintiff - Appellant

v.

SOUTHWESTERN BELL TELEPHONE CO

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas
No. MO-00-CV-57

Before KING, Chief Judge, and BENAVIDES and CLEMENT, Circuit
Judges.

PER CURIAM:[*]

Plaintiff-Appellant Dick W. Arrington appeals the district

court's grant of summary judgment to Defendant-Appellee

Southwestern Bell Telephone Company ("SW Bell") on his disability

discrimination and retaliation claims.  For the following

reasons, we AFFIRM.

I.    **BACKGROUND**

Arrington was employed by SW Bell from 1974 to 1998.

---

[*]    Pursuant to 5TH CIR. R. 47.5, the court has determined
that this opinion should not be published and is not precedent
except under the limited circumstances set forth in 5TH CIR. R.
47.5.4.

Beginning in 1979, Arrington worked as a Customer Services Technician ("CST"), installing and repairing phones and phone lines for SW Bell's customers at their homes and places of business. Arrington was diagnosed with diabetes in 1986, and his supervisor, Junior Brown, admits that he and the company were aware of this diagnosis. In fact, in December 1995, Arrington had to take disability leave due to problems associated with diabetic ulcers on his feet. After a dispute over his date of return, Arrington was discharged and filed a complaint with the Equal Employment Opportunity Commission ("EEOC"). Arrington and SW Bell subsequently settled their dispute, and Arrington was reinstated to his position as a CST in January 1997.

SW Bell repeatedly counseled Arrington for absenteeism and productivity problems beginning in 1987. In addition, the company began to receive numerous complaints from customers about Arrington's physical appearance, attitude, and skill level in 1988, for which Arrington was also repeatedly counseled. In 1995, Arrington was informed by SW Bell that, because of his low productivity and tendency to waste time on the job, he was ineligible to work overtime until there was a "noticeable improvement" in his performance. This restriction continued to apply after Arrington was reinstated in January 1997.

In November 1997, SW Bell placed Arrington on Decision Making Leave due to a customer's complaints that Arrington mistakenly cut the customer's doorbell wire, that his appearance

upset the customer's daughter, and that he had a poor attitude. Under the Leave, Arrington was given a day to decide whether to return to work at SW Bell. He agreed to return and was placed on probation for one year, during which he was subject to dismissal for unsatisfactory performance of his job duties. Then, on June 24, 1998, Junior Brown visited a job site listed on Arrington's schedule, but he could not find Arrington. Both parties agree that Brown contacted the customer, Ms. Prickle, the next day to determine whether Arrington had, indeed, worked there. According to Brown, Prickle complained about Arrington's inability to finish the job and his rude behavior; Brown also contends that Arrington improperly coded his work for Prickle, in violation of company policy. As a result, Arrington was suspended from his CST position, and SW Bell later offered him a Supplies Attendant position, which did not involve either customer contact or productivity requirements. When Arrington refused to accept this position, SW Bell dismissed him.

After his second termination from SW Bell, Arrington initiated the present lawsuit, alleging that SW Bell violated the Americans with Disabilities Act ("ADA") by subjecting him to disparate treatment and eventually firing him because of his diabetes. Arrington also alleges that his treatment and discharge from SW Bell were improperly motivated by retaliation for his filing of an EEOC complaint in 1996. For example, Arrington believes that SW Bell solicited all of the customer

-3-

complaints against him and that other, less efficient CSTs were neither disciplined nor counseled, as he was, for poor productivity.

In January 2003, SW Bell filed a motion for summary judgment, asserting that Arrington had failed to establish either that he suffered from a legally cognizable "disability" or that SW Bell's proffered reasons for firing him were pretextual. The district court agreed, and granted summary judgment in favor of SW Bell on both the disability discrimination and retaliation claims in May 2003. Arrington appeals both of these decisions.

## II.   STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same standard as the district court.    Seaman v. CSPH, Inc., 179 F.3d 297, 299 (5th Cir. 1999).  Summary judgment is appropriate when the record demonstrates no genuine issue of material fact and where the moving party is entitled to a judgment as a matter of law.  FED. R. CIV. P. 56(c).  Although in our review of the record we must draw all reasonable inferences in favor of the nonmoving party, "[t]he moving party is entitled to a judgment as a matter of law [if] the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).  Moreover, we have stated that the

nonmoving party does not demonstrate the existence of a genuine issue of fact (and does not thereby avoid summary judgment) by asserting "some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (citations and internal quotation marks omitted).

## III. DISCUSSION

### A. *Disability Discrimination*

A plaintiff may prove intentional discrimination under the ADA either by presenting direct evidence of discrimination or by utilizing the familiar McDonnell Douglas burden-shifting method of proof. Seaman, 179 F.3d at 300. Because Arrington provides only circumstantial evidence of discrimination, we review his claim under the latter standard. To establish a prima facie case of disability discrimination, Arrington must show that he "(1) suffers from a disability; (2) was qualified for the job; (3) was subject to an adverse employment action, and (4) was replaced by a non-disabled person or treated less favorably than non-disabled employees." Id.; see also 42 U.S.C. § 12112(a) (2000).

The parties dispute whether Arrington has met his burden of proof regarding the first element of the prima facie case. Under the ADA, a "disability" is defined as

> (A) a physical or mental impairment that
> substantially limits one or more of the major life

-5-

activities of [an] individual;
        (B) a record of such an impairment; or
        (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2) (2000).  Arrington asserts that he meets either definition (A) or definition (B) because he suffers from diabetes.[2]  Specifically, he argues that this circuit held, in Gonzales v. City of New Braunfels, 176 F.3d 834, 837 (5th Cir. 1999), that insulin-dependent diabetes is a "disability" as that term is defined in the ADA.  SW Bell disagrees, and contends that Arrington must produce evidence suggesting that his diabetic condition "substantially limits" at least one of his "major life activities."  See 42 U.S.C. § 12102(2)(A); EEOC v. R.J. Gallagher Co., 181 F.3d 645, 655 (5th Cir. 1999) (holding that, for a plaintiff to prove that he has a "record of impairment" under 42 U.S.C. § 12102(2)(B), "there must be a record of an impairment that substantially limits one or more of [his] major life activities").

SW Bell correctly identifies the flaws in Arrington's position.  Gonzales does not stand for the proposition that diabetes is a disability per se; rather, Gonzales merely noted that, at that time, this circuit's precedents required a plaintiff's claim that he suffered a "disability" to be evaluated by considering the impact of the plaintiff's untreated impairment on his major life activities.  176 F.3d at 837.  Under that test,

_____

    [2]    Arrington concedes that he was not regarded as disabled.

-6-

the Gonzales court observed that insulin-dependent diabetes would qualify as a disability because, if someone with this disease is deprived of insulin, he will lapse into a coma.  Id.  But this observation was mere dicta, and the Gonzales court cautioned that the Supreme Court was currently considering whether disabilities should, in fact, be measured without reference to mitigating factors.  Id.  Thus, not only is this observation not binding precedent, but its logical force has been undermined by the Supreme Court's subsequent determination, in Sutton v. United Air Lines, Inc., 527 U.S. 471, 482-83 (1999), that "[a] person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity."  Instead, whether a person is disabled under the ADA "depends on whether the limitations an individual with an impairment actually faces are in fact substantially limiting."  Id. at 488.[3]

In Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), the Supreme Court further clarified that "[i]t is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a

---

[3]     Moreover, Sutton specifically cautioned that assessing diseases in their untreated state would require courts to, for example, treat all diabetics as disabled per se, a result which the Court noted "is contrary to both the letter and the spirit of the ADA."  527 U.S. at 484; see also Waldrip v. Gen. Elec. Co., 325 F.3d 652, 656 (5th Cir. 2003) ("[N]either the Supreme Court nor this court has recognized the concept of a per se disability under the ADA . . . .").

medical diagnosis of an impairment"; instead, plaintiffs are required to offer evidence of the "extent of the limitation . . . in terms of their own experience." Id. at 198 (citation and internal quotation marks omitted). Therefore, because Arrington attempts to prove that he suffers from a disability simply by referring to his medical diagnosis of diabetes, Arrington's claim must fail. He has not explained, in either his opposition to summary judgment or his brief on appeal, how his diabetes has limited any of his major life activities.

Nevertheless, in his deposition, Arrington complained that, when he worked at SW Bell, his diabetes affected his "production."[4] Viewing the record in the light most favorable to Arrington, he may have been attempting to argue that his diabetes qualifies as a disability because it substantially limited his major life activity of "working." But this argument fails as a matter of law. While we have recognized that "working" is a major life activity for the purposes of the ADA, R.J. Gallagher Co., 181 F.3d at 654, this court has also explained that "[e]vidence of disqualification from a single position or a narrow range of jobs will not support a finding that an individual is substantially limited from the major life activity

---

[4] Additionally, in his motion for summary judgment, Arrington stated that SW Bell should have accommodated his disability by allowing him additional time to complete his jobs. But Arrington also conceded that he never requested that SW Bell provide him with any reasonable accommodations.

-8-

of working." <u>Talk v. Delta Airlines, Inc.</u>, 165 F.3d 1021, 1025 (5th Cir. 1999); <u>accord</u> <u>Sutton</u>, 527 U.S. at 491. Thus, because he does not claim that he was incapable of performing a range of jobs due to his diabetes, Arrington has not demonstrated that he has either a disability or a record of impairment under the ADA.[5]

   B.   *Retaliation*

To establish a prima facie case of retaliation, a plaintiff must prove that (1) he engaged in an activity protected by the ADA, (2) he was subjected to an adverse employment action, and (3) a causal connection existed between his participation in the protected activity and the adverse employment action. <u>Seaman</u>, 179 F.3d at 301. Once the plaintiff has proven a prima facie case, the burden of production shifts to the defendant to come forward with a legitimate, non-discriminatory reason for the adverse employment action. <u>Id</u>. If such a reason is provided, then the plaintiff must proffer evidence that the given reason is pretextual. <u>Id.</u> In essence, the plaintiff "must show that 'but for' the protected activity, the adverse employment action would not have occurred." <u>Id</u>.

We need not decide whether Arrington has established a prima

---

[5]    To the extent that Arrington's response to SW Bell's motion for summary judgment can be read to imply that the diabetic foot ulcers on his feet substantially limited his major life activity of "walking," it fails as a matter of law. <u>Cf.</u> <u>Talk</u>, 165 F.3d at 1025 (holding that a plaintiff's ability to walk was not substantially limited simply because she walked with a limp, moved slower than other people, and was required to wear special orthopedic shoes).

facie case of retaliation because he has failed to demonstrate a genuine issue of fact regarding whether SW Bell's legitimate, non-discriminatory reason for firing him was pretextual.  SW Bell has provided evidence that Arrington was discharged due to his troubled performance history and the company's receipt of numerous customer complaints regarding Arrington's appearance, demeanor, and working skills.  In addition, SW Bell has shown that, in an attempt to help Arrington improve his performance and prevent his termination, SW Bell placed Arrington on five different Performance Improvement Plans, offered him assistance from the company's Employee Assistance Program (he declined), and offered him two days of "ride along" assistance from a training manager (he refused to participate on the second day).  Yet, after he was placed on one year of probation and warned that further problems would warrant immediate dismissal, Arrington was the subject of another customer complaint.  But because Arrington's difficulties were centered on interaction with customers and his level of productivity, SW Bell asserts, and Arrington concedes, that instead of being immediately fired he was offered the Supplies Attendant position, which he declined.  Thus, SW Bell has met its burden of providing a legitimate, non-discriminatory reason for discharging Arrington.

In rebuttal, Arrington provides only a scintilla of evidence that SW Bell's proffered reasons are pretextual.  Arrington claims that, after he returned to work in 1997, SW Bell unfairly

disciplined him for his poor performance while the company's other employees with similar productivity levels were not disciplined. For support, Arrington provides a statement from Clay Everett, Arrington's union supervisor, that refers to Arrington's job productivity as in the "middle of the pack" compared to other SW Bell employees.[6] Yet, both Everett and Arrington have also admitted that Arrington was once one of the slowest employees in Midland and that, although his performance was improving, he had not achieved the "mark where he needed to be" before he was terminated.

In addition to contesting SW Bell's view of his productivity, Arrington alleges that the customer complaints lodged against him were improperly solicited by SW Bell's employees. But other than the Prickle incident, where Arrington challenged his supervisor to call the customer and check that he was really working at her home, Arrington provides no evidence to support his claim of solicitation. The remainder of Arrington's examples of disparate treatment––that he was sent home for wearing footwear that another CST was allowed to wear, that he

_____

[6] Everett's statement refers to a document comparing the number of jobs performed per day by many of SW Bell's employees. Because this document has not been made a part of the summary-judgment record, it is impossible for this court to know whether that document compared a variety of SW Bell's statewide employees, only SW Bell's CSTs or, more specifically, only those CSTs who worked in the Midland office. In addition, the record does not reflect whether any of the employees on this list were subject to discipline nor does it reflect the number of customer complaints associated with each employee.

-11-

was given an un-air-conditioned van rather than the cable truck driven by other CSTs, that his tools were substandard, that his supervisors made rude comments about his age and productivity, and that he was subjected to more extensive medical evaluations than his fellow CSTs––are not relevant to the issue at hand: whether SW Bell's explanation that Arrington was fired for poor productivity and customer complaints is merely pretext for retaliation.

In support of his claim of pretext, Arrington also contends that SW Bell did not follow its standard practice of allowing a union supervisor to investigate the customer complaints lodged against him. Arrington buttresses his argument by pointing out that Everett has similarly expressed his belief that the final customer complaint, involving Prickle, was not "objectively" investigated.[7] Moreover, Arrington and Everett dispute SW Bell's version of the Prickle incident, asserting that the customer was mainly upset that Arrington did not complete the job, which they believe was caused by his ineligibility to work overtime. Yet, the summary-judgment record contains admissions from both Arrington and Everett that Arrington did not use an official SW Bell code when he filed the paperwork regarding his inability to complete the Prickle job, although neither thinks that this

---

[7] Everett did not claim to have personal knowledge that the other customer complaints lodged against Arrington were improperly investigated.

"offense" was serious.

Viewed in its entirety, Arrington's evidence of pretext and retaliatory treatment is insufficient to permit a reasonable jury to conclude that Arrington would not have been terminated "but for" his filing of an EEOC complaint in 1996. Arrington fails to identify any similarly situated employees (i.e., those with a history of numerous customer complaints and a similarly low productivity level) who were neither disciplined nor discharged for their poor job performance. Arrington believes that he was not a poor CST, but "[m]erely disagreeing with an employer's negative performance assessment is insufficient to show pretext." Perez v. Region 20 Educ. Serv. Ctr., 307 F.3d 318, 325 (5th Cir. 2002). Moreover, Arrington's subjective belief that SW Bell solicited the customer complaints, without more, is also insufficient to cast doubt on SW Bell's proffered reason for his termination. See Auguster v. Vermilion Parish Sch. Bd., 249 F.3d 400, 403 (5th Cir. 2001) ("This court has consistently held that an employee's 'subjective belief of discrimination' alone is not sufficient to warrant judicial relief." (citations omitted)).[8] Therefore, the district court properly held that SW Bell was

---

[8] The one factor in Arrington's favor is his evidence from Clay Everett, who also believes that Arrington was treated unfairly. Yet Everett admitted that Arrington had a history of poor productivity and customer complaints, and he did not claim to have personal knowledge that the complaints against Arrington were either baseless or solicited by Arrington's supervisors at SW Bell.

entitled to summary judgment on Arrington's retaliation claim.

**IV.  CONCLUSION**

Accordingly, we AFFIRM judgment of the district court.