James Henry MORGAN,
et al., Plaintiffs

v.

POWE TIMBER COMPANY,
et al., Defendants.

No. CIV.A.4:03CV363LN.

United States District Court,
S.D. Mississippi,
Jackson Division.

March 24, 2005.

Dana G. Kirk, Kirk Law Firm, Houston, TX, Rance N. Ulmer, Bay Springs, for Plaintiffs or Petitioners.

Frank D. Montague, Jr., Montague, Pittman & Varnado, Hattiesburg, John Stuart Robinson, Jr., Robert A. Biggs, III, Armstrong Allen, PLLC, Vicki L. Gilliam, Ashley E. Calhoun, Charles (Chan) E. McLeod, Craig E. Brasfield, Joshua J. Metcalf, Richard L. Forman, Tanya K. Dearman, Walter G. Watkins, III, Walter G. Watkins, Jr., Forman, Perry, Watkins, Krutz & Tardy, Jackson, for Defendants or Respondents.

# 1034

*MEMORANDUM OPINION
AND ORDER*

TOM S. LEE, District Judge.

This cause is before the court on the following motions:

(1) Motion by defendant Danaher Corporation for summary judgment;

(2) Motion by defendants Joslyn Manufacturing Company and Danaher Corporation for summary judgment based on preemption; and

(3) Motion by defendants Joslyn Manufacturing Company and Danaher Corporation for summary judgment on plaintiffs' claims for damages resulting from exposure to chromated copper arsenate.

These motions have now been fully briefed by the parties and the court, having considered the memoranda of authorities, together with attachments on these various motions, finds and concludes as follows.

Defendant American Wood, a division of defendant Powe Timber Company, has operated a wood processing facility near Richton, Mississippi, since it purchased the plant from Joslyn Manufacturing (and Supply) Company in 1980. Joslyn owned and operated the plant from 1965, when the plant was built, to 1980, when it sold the plant to American Wood. The eighty-one plaintiffs herein brought this action seeking damages for wrongful death and personal injuries allegedly sustained as a result of their exposure to various chemicals used in the wood-treating process.[1] Plaintiffs allege after treating wood at the plant using toxic and extra-hazardous chemicals, including creosote, pentachlorophenol, copper, chromium and arsenic, defendants sold the odd shaped and spare wood chips as byproducts to the unsuspecting public, including plaintiffs, to be used as heating and cooking fuel in their households. Plaintiffs assert various products liability claims against defendants, including negligence, gross negligence, breach of warranty and strict liability, based generally on allegations that in selling and/or otherwise distributing the chemically-treated wood chips for use as an alternative fuel source for heating and cooking, defendants, who knew or should have known of the dangerous propensity of the wood chips to cause harm to those who might be exposed to the wood chips, failed to provide reasonable, adequate and timely warnings of the hazards associated with exposure to treated wood.[2]

*Danaher's Motion for Summary Judgment*

Danaher has been sued by plaintiffs not for any alleged wrongs committed by Danaher itself, but rather on the basis that Danaher is vicariously liable for the torts of Joslyn committed during Josyln's ownership of the Richton facility from 1965 to 1980. In its motion for summary judgment, Danaher maintains that Joslyn is merely an indirect, independent subsidiary with a separate corporate existence for whose alleged torts, which occurred years before Danaher acquired Joslyn, it cannot possibly be held accountable.

In their first "partial" response to Danaher's summary judgment motion, plaintiffs took the position that Danaher is liable for Joslyn's alleged torts either on the basis of successor liability, a position grounded on the premise that Joslyn merged with Danaher in 1995 so that Dan-

---

1. This case was originally brought in the Circuit Court of Jasper County by approximately 1,300 plaintiffs and was removed by defendants to this court. By order entered June 2004, the claims of 1281 plaintiffs were severed and remanded, leaving 81 plaintiffs in this action.

2. As discussed *infra* at 1045, although the predominate theme of plaintiffs' complaint is failure to warn, their claims are not necessarily so limited.

aher, as Joslyn's successor, became liable by operation of law for Joslyn's pre-merger torts, or on the alternative basis that the facts support piercing the corporate veil between Danaher and Joslyn. Upon further briefing, it has become clear that plaintiffs' position is bottomed entirely on their claim that Joslyn merged with Danaher in 1995.

As Danaher explained in its motion and supporting brief, Joslyn was founded in 1902 and has been and continues to be involved in manufacturing various devices for the electric utility industry. Danaher is a holding company with ownership, directly or indirectly, in a host of manufacturing businesses throughout the world, including Joslyn, which, according to Danaher, is merely one of approximately 450 subsidiaries in which Danaher has interests. Although its version of the transaction is very much disputed by plaintiffs, Danaher explains in its motion that it acquired Joslyn in 1995 by way of a reverse triangular merger. According to Danaher, to accomplish the acquisition, DH Holdings, a Danaher subsidiary, created a wholly owned subsidiary, TK Acquisition Corporation, for the limited purpose of acquiring the Joslyn stock. TK Acquisition acquired more than 75% of the stock of Joslyn through a tender offer and acquired the remaining stock through a cash out merger, in which all remaining shareholders of Joslyn received cash for their Joslyn stock, following which the Joslyn stock owned by TK Acquisition was cancelled. The merger was structured so that Joslyn would be the surviving corporation, so at the effective time of the merger, TK Acquisition was merged into Joslyn. Jos-

lyn survived the merger and continued its existence, whereas TK Acquisition ceased to exist. As a result of the merger, D.H. Holdings, Danaher's subsidiary, owned 100% of Joslyn's stock, and hence, Joslyn became a wholly-owned indirect subsidiary of Danaher.

■ As Danaher notes, and plaintiffs do not dispute, applicable law is clear that a parent corporation "is not responsible for the pre-acquisition liabilities of its wholly-owned subsidiary." *Binder v. Bristol–Myers Squibb, Co.*, 184 F.Supp.2d 762, 773 (N.D.Ill.2001).[3] *Scott v. NG U.S. 1, Inc.*, 2003 WL 22133177 (Mass.2003), is an example of this principle. There, the plaintiff sued the parent company for ground contamination caused by its subsidiary decades before the parent-subsidiary relationship came into existence. The court concluded that in the absence of evidence of "active, significant or direct participation or control by [the parent] in the affairs of [the subsidiary] with regard to the operation of the … facility [where the alleged contamination occurred]," the parent corporation "should not be held responsible for the acts of a subsidiary that occurred decades before the parent acquired the subsidiary." *Id.* at *7. *See also CM Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 539 (7th Cir.1980) (refusing to apply corporate veil piercing doctrine where there was no evidence that the subsidiaries were "shells or sham corporations during the period" at issue); *Ziegler v. Delaware County Daily Times*, 128 F.Supp.2d 790 (E.D.Pa.2001) (observing that evidence as to contacts and interrelations bearing on the corporate relationship between the

---

**3.** Danaher notes that under Mississippi's choice of law principles, which apply in a diversity action such as this, Delaware law applies to determine this issue of corporate liability inasmuch as Joslyn is a Delaware limited liability corporation and Mississippi Code Annotated § 79–29–1001 provides that

"the liability of an LLC's members or owners is to be governed by the laws of the state under which the LLC is organized." Plaintiffs do not contend otherwise, but there appears to be no conflict in any potentially applicable law on the issues presented.

parent and subsidiary at a point in time after the events giving rise to the litigation was immaterial since the relevant question was the nature of the relationship of the companies at the time of the challenged activity).

Here, plaintiffs acknowledge that Danaher's liability is sought to be predicated solely on torts allegedly committed during Joslyn's ownership of the Richton wood processing facility, which ended in 1980, fifteen years before the existence of any relationship between Danaher and Joslyn. Plaintiffs claim, though, that Danaher is nonetheless liable for Joslyn's torts because the relationship between Danaher and Joslyn has never been that of parent and subsidiary, but rather, according to plaintiffs, Joslyn actually merged with Danaher in 1995, making Danaher liable for Joslyn's torts under principles of successor liability. That is, plaintiffs submit that while Danaher would have this court believe that Joslyn merged with TK Acquisition, the merger was really between Danaher and Joslyn so that Danaher, as Joslyn's successor in interest, is vicariously liable as a matter of law for Joslyn's alleged torts. See Fountain v. Colonial Chevrolet Co., 1988 WL 40019, at *7 (Del.Super.1988) (explaining that under Delaware's rule of corporate successor liability, "A buyer may be found to have assumed the selling corporation's liability ... if there has been a de facto merger or consolidation or if the successor corporation is a mere continuation of the predecessor under a different corporate name") (citing Fehl v. S.W.C. Corp., 433 F.Supp. 939, 945 (D.Del.1977)); Corporate Property Associates 8, L.P. v. Amersig Graphics, Inc., 1994 WL 148269, at *5 (Del.Ch.1994) (recognizing that "a corporation, under the guise of an asset transfer, should not be permitted to take over the essence of another corporation—that is, essentially merge with that other corporation—yet avoid certain liabilities of the predecessor

corporation which it does not wish to assume"); see also Hood v. King, 255 So.2d 912, 916–16 (Miss.1971) (recognizing that in a merger, the surviving corporate entity assumes the liabilities of the subsumed corporation by operation of law).

Danaher, on the other hand, insists in its motion that it cannot be the successor to Joslyn by merger because no merger between Danaher and Joslyn ever occurred. Joslyn, it declares, still exists to this day as an indirect Danaher subsidiary for whose pre-acquisition torts it has no liability.

In support of their contention that the "real merger" was not between Joslyn and TK Acquisitions, but rather between Joslyn and Danaher, and that Danaher concocted this paper merger between Joslyn and TK Acquisition in an effort to avoid assuming Joslyn's liabilities, plaintiffs rely primarily on the fact that TK Acquisition was nothing more than "an uncapitalized corporate shell" which was created by Danaher and existed solely in connection with the merger. TK Acquisition, they assert, was a mere "fiction" created by Danaher, which was the obvious source of financing for the acquisition of Joslyn. From these facts, plaintiffs conclude that "[i]t is disingenuous at best [for Danaher] to contend that TK Acquisition, rather than Danaher, made the tender offer for Joslyn's stock or acquired Joslyn's stock in the merger." Plaintiffs declare:

> Danaher created TK Acquisition solely for purposes of the merger with Joslyn, never capitalized it, never allowed it to conduct any business other than the merger, and dissolved TK Acquisition at the effective time of the merger.... TK Acquisition was never a bona fide entity [but was instead an uncapitalized artifice created, used and dissolved for the sole purpose of the Danaher–Joslyn merger]

and ... the real merger in this transaction was between Joslyn and Danaher. In other words, what plaintiffs ultimately suggest is that the court should pierce the corporate veil between Danaher and TK Acquisition and conclude that the merger was between Joslyn and Danaher, i.e., that the court should "pierce the merger." [4]

In the court's opinion, plaintiffs' position is patently without merit. Their impression as to the mechanics of the subject merger transaction is essentially accurate; but their conclusion as to the effect of the transaction is clearly incorrect and ignores the abundance of authority which makes plain that piercing principles invoked by plaintiffs have no relevance to this transaction, which was a lawful and proper merger between Joslyn and TK Acquisition. [5]

The transaction at issue, by which Danaher acquired Joslyn *as a subsidiary,* is a standard method of acquisition in which a target corporation (Joslyn) becomes a wholly-owned subsidiary of a parent corporation (Danaher) without any change in its corporate existence. Such transactions, known as "triangular mergers," are "common and have a myriad of legitimate justifications." *Lewis v. Ward,* 852 A.2d 896, 906 (Del.Supr.2004); *see also Lewis v. Ward,* 2003 WL 22461894, at *4 n. 18 & n. 19 (Del.Ch. Oct.29, 2003) (noting that the triangular structure offers numerous advantages that make it "the preferred method of acquisition for a wide range of transactions"). This type of transaction has been explained as follows:

A triangular merger permits A, the acquiring company, to acquire control of T, the target company, without A being a constituent corporation by forming a new Delaware subsidiary, (S), into which T is merged. [Balotti and Finkelstein, *The Delaware Law of Corporations and Business Organizations,* § 9.7 (Aspen Law & Business 1998) ]. The stockholders of A do not have the right to vote on the merger, nor are they entitled to appraisal rights since A is not a constituent corporation. *Id.* As the sole stockholder of S, A votes all of the stock of S in favor of the merger. *Id.* The stockholders of T have the same rights as in a two-party merger. *Id.* In a reverse triangular merger, the merger proceeds in the same manner as a triangular merger except S is merged into T, with T surviving. *Id.* at § 9.8. The outstanding shares of stock of S (all of which are owned by A) are converted into shares of stock of T. *Id.* The shares of stock of T outstanding immediately before the effective time of the merger are converted into securities of A, cash or other consideration. *Id.* The advantage of this type of merger is that T will become a

---

**4.** More accurately, they suggest that the court should recognize there are numerous issues of material fact bearing on whether T.K. Acquisition was Danaher's alter ego so that it can fairly be said that Joslyn merged with Danaher, such issues being said to include "which company (i.e., Danaher or TK Acquisition) made the tender offer and acquired Joslyn's stock," "whether Joslyn merged with Danaher (rather than TK Acquisition)," "whether Joslyn still exists as an independent company" and "whether Danaher assumed Joslyn's liabilities."

**5.** In their argument on this issue, plaintiffs tend to overlook the fact that T.K. Acquisition

was not a direct subsidiary of Danaher but was instead a subsidiary of D.H. Holdings, which was a direct subsidiary of Danaher. In other words, there was another corporate "layer" involved in the transaction which plaintiffs would have the court disregard. They have not established, however, that the facts would justify doing that. Nevertheless, while the court is fully cognizant of D.H. Holding's place in the transaction, solely for purposes of facilitating its discussion of this issue, the court will treat the transaction as one involving only Danaher, T.K. Acquisition and Joslyn.

wholly-owned subsidiary of A without any change in its corporate existence. *Id.* Thus, the rights and obligations of T, the acquired corporation, are not transferred, assumed or affected. *Id.*

*Binder v. Bristol–Myers Squibb, Co.,* 184 F.Supp.2d 762, 772 (N.D.Ill.2001). This precisely describes what transpired in Danaher's acquisition of Joslyn. That is,

> Applying the reverse triangular merger scenario to the case at hand, "A" represents [Danaher] the acquiring company; "T" represents [Joslyn], the target company; and "S" represents TK Acquisition, the ... subsidiary. First, the [Danaher] Subsidiary is merged into [Joslyn], with [Joslyn] surviving. Next, the outstanding shares of stock of the [Danaher] Subsidiary (all of which are owned by [Danaher] ) are converted into shares of stock of [Joslyn]. Then, the shares of stock of [Joslyn] outstanding immediately before the effective time of the merger are converted into securities of [Danaher], cash or other consideration. This results in [Joslyn] becoming a wholly-owned subsidiary of [Danaher] without any change in its corporate existence. Thus, the rights and obligations of [Joslyn], are not transferred, assumed or affected.

*Id.*

A standard feature of triangular mergers is the creation by the acquiring company of a "phantom," "interim" or "transitory" subsidiary, controlled by the acquiring company, that can be merged into the target company (as occurs in a forward triangular merger) or into which the target company can be merged (as occurs in a reverse triangular merger). *See Martin v. Kilgore First Bancorp, Inc.,* 747 F.2d 1024, 1025 (5th Cir.1984) (describing merger transaction as one involving "interim or 'phantom' bank ... formed only to serve the interim function of controlled subsidiary needed to execute the reverse trian-

gular merger"); *Triumph–Connecticut Ltd. Partnership v. Ascent Pediatrics, Inc.,* 2004 WL 1050746, *3 (Mass.Super.2004) (explaining that "[i]n a reverse triangular merger, an acquiring company forms a transitory subsidiary, which merges into the target company. The shareholders of the target company are given consideration for their shares and their stock is cancelled. The target company remains a corporation, but it becomes a subsidiary of the acquiring company.").

Although Danaher's position as to the legitimacy of the transaction in question as a valid merger between TK Acquisition and Joslyn and an acceptable method of Danaher's acquiring Joslyn as a subsidiary was fully covered in Danaher's motion and supporting brief, plaintiffs inexplicably failed in their response to address the arguments and authorities presented by Danaher. Instead, they posit, without discernable legal support, that because the "phantom" subsidiary [TK Acquisition] created by Danaher for the purpose of effecting the merger was a mere shell controlled entirely by Danaher, the court should disregard the corporate existence of the subsidiary [TK Acquisition], and conclude that Joslyn, the target, merged not with the subsidiary [TK Acquisition] but with Danaher, leaving Danaher as Joslyn's successor. In other words, plaintiffs overlay the merger transaction with piercing principles to reach their conclusion that the merger between TK Acquisition and Joslyn was not a legitimate merger.

*In re Thorotrast Cases* involved similar protestations by the plaintiffs to the legitimacy of a triangular merger in which a subsidiary, TRI, was created and capitalized for the purpose of an acquisition by the parent corporation, Pipeline, of a target company, Heyden. *In Re Thorotrast Cases,* 1994 WL 1251120, 26 Phila. Co. Rptr. 479 (Pa.Com.Pl.1994). Similar to the

arguments of the plaintiffs here, the plaintiffs there asserted that the parent, Pipeline, had control over the subsidiary, TRI, because

> TRI was capitalized solely by Pipeline funds for no consideration;
> TRI was set up as a 'Paper Title' created only for Pipeline's acquisition of Heyden; . . .
> Pipeline, through corporate minutes and press releases, announced its intention to acquire Heyden.
> Pipeline shared with TRI common officers and directors originally paid by Pipeline;
> Pipeline shared a post office box with TRI;
> TRI's acquisition of Heyden was funded by Pipeline stock.

*Id.,* 26 Phila. Co. Rptr. at 490. And, as do plaintiffs here, the plaintiffs in *In re Thorotrast Cases* also claimed that these same factors showed that "Pipeline merged with TRI and that TRI was a mere instrumentality or agent of Pipeline." *Id.*[6] The court rejected the plaintiffs' argument, observing first that the "triangular transaction between Pipeline, TRI and Heyden was a standard method of forming a subsidiary to make an acquisition," and that "[t]he interrelation of Pipeline and TRI at the inception of TRI was also a standard way of forming a subsidiary to make an acquisition." *Id.* at 494. "This type of transaction," the court continued, "does not, in itself, implicate Pipeline as a corporate 'Godfather' involved in a corporate shell game to unjustly avoid potential liability as plaintiffs suggest. Rather, this type of triangular transfer, where a parent corporation (Pipeline) creates a subsidiary [TRI] in order to acquire a 'target' corporation

(Heyden) is a recognized and legitimate type of corporate evolution." *Id.*

The court specifically rejected the plaintiffs' argument that the lack of separateness between Pipeline and TRI at the time of the merger supported the conclusion that the target had merged with Pipeline, explaining,

> The closeness of the parent-subsidiary relationship between Pipeline and TRI, manifest only at the birth of TRI's corporate existence, does not show merger, agency, or provide the requisite evidence to satisfy the 'control' and 'injustice' prongs of the test for piercing the corporate veil.

*Id.* at 490. In this same vein, the court remarked that

> These facts (which plaintiffs cited as evidence of the lack of corporate separateness between Pipeline and TRI) only apply to the formative stages of TRI's immediate post-incorporation existence. They do not accurately reflect TRI's nineteen year separate, corporate existence (since the time of the merger). *The interrelationship during formation does not create an issue of material fact as to Pipeline's control over TRI.*

*Id.* at 491 (emphasis added). *See also Equity Group Holdings v. DMG, Inc.,* 576 F.Supp. 1197, 1204 (S.D.Fla.1983)(rejecting argument that the real acquiror was the parent of the merger subsidiary, and stating, "This argument is not without its intellectual appeal, and on a theoretical level it may be quite descriptive; but this is a Court of law and equity rather than one of metaphysics and philosophy.").

To reiterate, as it has evolved, plaintiffs' only argument in response to Danaher's

---

6. The court notes that *In re Thorotrast* involved a *forward* triangular merger, in which the subsidiary, rather than the target, was the surviving corporation in the merger. Thus, because TRI survived the merger, the plaintiffs' argument there was that TRI had merged with the parent, Pipeline. Here, because Joslyn was the surviving company in the TK Acquisition/Joslyn merger, the argument is that Joslyn merged with Danaher.

motion is that Joslyn merged with Danaher, making Danaher liable as Joslyn's successor. As is manifest from the foregoing, Joslyn did not merge with Danaher, but was instead acquired by Danaher, intact, as an independent subsidiary.[7] Plaintiffs have not argued or pointed to any evidence that would support piercing the corporate veil between Danaher and Joslyn.[8] It follows, then, that Danaher's request for dismissal is well taken and it will be granted.

*Joslyn's Motion for Summary Judgment Based on Preemption*

Joslyn seeks summary judgment on the basis that plaintiffs' claims, all of which Joslyn submits are based on a failure to warn, are preempted by the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA).

▮ FIFRA is a comprehensive regulatory scheme aimed at controlling the use, sale and labeling of pesticides. As the Fifth Circuit summarized in *Andrus v. AgrEvo USA Co.*, 178 F.3d 395, 398 (5th Cir.1999), under FIFRA, all pesticides and herbicides sold in this country are required to be registered with the Environmental

Protection Agency (EPA), *see* 7 U.S.C. § 136a(a), which is given exclusive responsibility under the Act for reviewing and evaluating a manufacturer's proposed product, including the label under which the manufacturer proposes to market the product, and for registering the pesticide if the EPA determines "that its composition is such as to warrant the proposed claims for it, that its labeling complies with FIFRA requirements, that it will perform its intended function without unreasonable adverse effects on the environment, and, when used in accordance with widespread practice, that it will not generally cause unreasonable adverse effects on the environment." *Id.* (citing 7 U.S.C. § 136a(c) and 40 C.F.R. § 152.50 & pt. 156). Section 136v of FIFRA includes the following preemption provision:

(a) In General

A State may regulate the sale or use of any federally registered pesticide or device in the State, but only if and to the extent the regulation does not permit any sale or use prohibited by this subchapter.

---

7. Plaintiffs claim that in 1988, Joslyn engaged in a restructuring designed and undertaken with the improper purpose of evading liability for its environmental liabilities. Plaintiffs argue that this restructuring should be disregarded by this court such that "Joslyn Corporation which merged with Danaher in 1995 is declared to be one in the same entity and the liability successor to Joslyn which owned and operated the Richton wood yard." The relevance of plaintiffs' argument concerning this issue as it bears on Danaher's potential liability is in doubt given the court's conclusion that Danaher did not merge with and hence did not assume the liabilities of any Joslyn entity. Moreover, as Danaher notes in its reply brief, plaintiffs have neither alleged nor offered proof that the restructuring to which plaintiffs refer altered Joslyn Manufacturing Company's assets or liabilities.

8. Plaintiffs point out in their supplemental brief that in recent months, Joslyn has been

"stripped of its assets to the prejudice of plaintiffs" and that in view of this development, equity supports piercing the corporate veil. To the point, plaintiffs advise that they have been provided a copy of a "Purchase and Sale Agreement between Joslyn Manufacturing Company, LLC and MacLean JMC LLC," dated November 17, 2004, pursuant to which Joslyn, though retaining its liabilities with respect to this and similar cases, has sold all its assets (other than realty) to MacLean and leased its real property to MacLean, rent free, and have been advised that Joslyn has loaned all the proceeds from the sale to Joslyn Hi–Voltage Company, LLC, another Danaher subsidiary. Plaintiffs submit that if the corporate veil is not pierced, plaintiffs are left with no remedy. The fact of this sale, alone, however, without more, is no basis for piercing a corporate veil when the facts otherwise do not support doing so.

**(b) Uniformity**

Such State shall not impose or continue in effect any requirements for labeling or packaging in addition to or different from those required under this subchapter.

It is by now well established that the term " 'any requirements' [in this statute] encompasses both positive state enactments as well as common-law causes of action." *Dow Agrosciences LLC v. Bates,* 332 F.3d 323, 328 n. 8 (5th Cir.2003) (citing *Andrus v. AgrEvo USA Co.,* 178 F.3d 395, 398 (5th Cir.1999)). The court in *Bates* identified three clear principles from several of its prior opinions addressing FIFRA preemption:

First, FIFRA does not completely preempt all state or local regulation of pesticides. *See [Hart v. Bayer Corp.,* 199 F.3d 239, 244 (5th Cir.2000) ] (rejecting an attempt to premise federal question jurisdiction on a claim of complete preemption). Second, FIFRA does not preempt common law that is unconcerned with herbicide labeling, nor does it preempt those state laws concerned with herbicide labeling that do not impose any requirement in addition to or different from the FIFRA requirements. *See Andrus,* 178 F.3d at 398; *see also Hart,* 199 F.3d at 245 ("FIFRA preemption does not extend to non-labeling state common-law causes of action."). Finally, FIFRA preempts state laws that either directly or indirectly impose different labeling requirements. *See [MacDonald v. Monsanto,* 27 F.3d 1021, 1025 (5th Cir.1994) ].

*Id.* at 329.

Joslyn maintains in its motion that plaintiffs' claims, regardless of how characterized in their complaint, are based on a failure to warn of dangers associated with burning wood treated with certain pesticides, and hence fall within the preemption expressly dictated by FIFRA. Plaintiffs deny FIFRA's applicability to their claims in this case on several bases, arguing that (1) FIFRA preemption extends only to manufacturers, sellers and distributors of EPA registered pesticides and does not extend to "applicators" such as Joslyn; (2) FIFRA does not apply to the products at issue because treated wood products are exempt from all provisions of FIFRA pursuant to the treated articles exemption codified at 40 C.F.R. § 152.25; (3) Joslyn/Danaher never sought to register any product with the EPA and there is no EPA-approved warning label applicable to the products of Joslyn/Danaher to which FIFRA preemption would apply; and (d) alternatively, all of plaintiffs' claims do not arise from Joslyn's failure to warn so that even if FIFRA preemption applied to plaintiffs' failure to warn claims, FIFRA does not preempt plaintiffs' claims against Joslyn for negligence in the sale of treated wood chips or for the sale of an unreasonably dangerous product. The court considers each of these arguments in turn.

■ Plaintiffs' contention that treated wood products are exempt from FIFRA regulation is based on 40 C.F.R. § 152.25, entitled "Exemptions for pesticides of a character not requiring FIFRA regulation," and which provides:

The pesticides or classes of pesticides listed in this section have been determined to be of a character not requiring regulation under FIFRA, and are therefore exempt from all provisions of FIFRA when intended for use, and used, only in the manner specified.

(a) Treated articles or substances. *An article or substance treated with, or containing, a pesticide to protect the article or substance itself (for example,* paint treated with a pesticide to protect the paint coating, or *wood products treated to protect the wood against insect or fungus infestation* ), if the pesticide is

registered for such use. (Emphasis added).

In response, Joslyn notes first that this provision was not enacted until 1988, eight years after Joslyn sold the wood treatment facility in Richton, and that at the time it owned the facility, "treated articles" were not exempt from FIFRA and were within the EPA's jurisdiction over treated lumber. Joslyn contends that under applicable principles, this provision does not apply retroactively to conduct occurring prior to its enactment, and hence has no relevance to the present inquiry.

Regarding the issue of retroactivity, plaintiffs, citing *Bradley v. Richmond School Board,* 416 U.S. 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476 (1974), propose it to be "well settled that a court must apply the law in effect at the time it renders its decision." However, in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994), the Supreme Court acknowledged a seemingly contradictory presumption *against* retroactivity, and clarified that while this language in *Bradley* "suggests a categorical presumption in favor of application of *all* new rules of law, ... *Bradley* did not alter the well-settled presumption against application of the class of new statutes that would have genuinely 'retroactive' effect." *Id.* at 276, 114 S.Ct. at 1503. The Court undertook to explain that

> [w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach.... When, however, the statute contains no such express command, the court must deter-

mine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed, when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at 280, 114 S.Ct. at 1505. In the court's opinion, application of the treated articles exemption to Joslyn's conduct predating its enactment would have an impermissible retroactive effect because, if the treated articles exemption wholly exempts wood treaters from every aspect of FIFRA regulation,[9] the statute would increase Joslyn's liability for past conduct and impose new duties with respect to transactions completed well prior to enactment of the exemption. *Cf. Redwing Carriers, Inc. v. Saraland Apartments, Ltd.,* 875 F.Supp. 1545, 1565 (S.D.Ala.1995), *rev'd in part on other grounds,* 94 F.3d 1489 (11th Cir.1996) (concluding that EPA's cancellation of pesticide-registration after the alleged use would not be applied retroactively since "[a]pplying retroactivity (in that) situation would improperly impair rights [the defendant] had before it acted, increase its liability for past conduct, or impose new duties with respect to transactions already completed" where there was no "'clear congressional intent' that the statute [was] retroactive").

Plaintiffs next declare that "Joslyn's status as an applicator under FIFRA is determinative of whether Plaintiffs'

---

9. Joslyn argues that even if the exemption applies retroactively, the exemption does not affect the FIFRA preemption analysis. It bases this argument on *Bioganic Safety Brands, Inc. v. Ament,* 174 F.Supp.2d 1168, 1177 (D.Colo.2001), which it reads as holding that the treated articles exemption applies only to FIFRA registration requirements and that labeling and packaging of exempted articles remains subject to FIFRA preemption. The court need not consider this argument inasmuch as it concludes that the exemption does not apply retroactively.

claims for failure to warn are preempted" inasmuch as "FIFRA preemption extends only to manufacturers, sellers and distributors of EPA-registered pesticides." For its part, Joslyn does not deny that it was not a manufacturer, seller or distributor of EPA-registered pesticides but rather, in treating wood at the Richton facility, was a "commercial applicator" of such pesticides. It submits, however, that FIFRA preemption is no less applicable merely because it was an applicator, and insists that FIFRA's preemption provision is intended to apply equally to manufacturers, sellers, distributors *and* applicators of EPA-registered pesticides. Having considered the parties' arguments on this point, the court would tend to agree with Joslyn that FIFRA preemption is not inapplicable to applicators solely because of their status as applicators.

In *Taylor AG Industries v. Pure–Gro*, 54 F.3d 555, 558 (9th Cir.1995), the court did state that FIFRA preemption extends to manufacturers, sellers and distributors of EPA-registered pesticides; but it did not hold (as plaintiffs claim) that such preemption does not also extend to applicators. The court's reasoning, in fact, supports a contrary conclusion. Specifically, the court made clear that "the [FIFRA preemption] analysis focuses not on whom the legal duty is imposed, but on whether the legal duty constitutes a state law requirement to provide information in addition to or different from the label." *Id.* at 561 n. 3. Thus, the court, which was considering whether preemption applied to claims against a pesticide distributor, held that "[w]here ... the distributor's liability is essentially predicated upon the language in the manufacturer's label, we apply FIFRA's preemption provision equally to manufacturers and distributors." *Id.* at 562. Consistent with this reasoning, to the extent plaintiffs' claims are grounded on an allegation that defendants should have provided warnings in addition to those contained on the manufacturer's EPA-approved label, plaintiffs cannot escape FIFRA preemption solely because the defendants are applicators. *Cf. Sirico v. Beckerle Lumber Supply Co., Inc.,* 227 A.D.2d 396, 642 N.Y.S.2d 55 (N.Y.1996) (holding that the failure to adequately label and failure to warn claims against a retail distributor of treated wood were preempted by FIFRA).

FIFRA places on the manufacturer the duty to register its product and to secure EPA approval of its label based on data furnished by the manufacturer. An applicator, to the same extent as a distributor or seller, is entitled to rely on the manufacturer's label, which has undergone a "rigorous label-approval process under FIFRA," *Taylor,* 54 F.3d at 563, and should not be burdened with the task of "research[ing] the accuracy of each manufacturer's label" when it, as contrasted with the manufacturer, is "the least likely to have access to such information." *Id.*

Moreover, while plaintiffs have cited cases in which courts have held that FIFRA did not preempt claims against applicators, Joslyn is correct that plaintiffs have cited no case in which claims against an applicator for failing to provide a warning that did not appear in the manufacturer's EPA-approved label escaped FIFRA's preemptive reach. Rather, in every case cited by plaintiffs in support of their argument that FIFRA preemption is inapplicable to applicators, the courts held only that FIFRA preemption did not foreclose claims against pesticide applicators based on their alleged failure to *convey* an EPA-approved warning, reasoning that finding a duty to convey such warnings would not have the effect of imposing requirements in addition to or different from the FIFRA requirements. *See Dow Chemical Co. v. Ebling,* 753 N.E.2d 633 (Ind.2001) (holding that state tort law duty to convey informa-

tion in EPA-approved warnings did not constitute a requirement additional to or different from those imposed by FIFRA); *Eyl v. Ciba–Geigy Corp.*, 264 Neb. 582, 650 N.W.2d 744, 758 (2002) (recognizing that a requirement to alter an EPA-approved warning is preempted by FIFRA, while a requirement to relay the EPA-approved warning does not implicate FIFRA preemption); *Villari v. Terminix Int'l, Inc.*, 692 F.Supp. 568, 578 (E.D.Pa.1988) (recognizing the distinction between failure to warn and failure to convey a warning and holding that although failure to warn claims are preempted by FIFRA, failure to relay a warning does not undermine FIFRA); *Pisano v. Budget Termite*, 2000 WL 226425 (Conn.Super.Ct.2000) (holding that if state law cause of action would impose requirements for labeling beyond FIFRA requirements then such actions are preempted but failure to convey a warning would not require FIFRA preemption).

■ Joslyn thus maintains that irrespective of whether there is any validity to plaintiffs' applicator distinction, such distinction is irrelevant, since this case involves a failure to warn of dangers that were never included on any EPA-approved label. That is, Joslyn observes that the only dangers of which plaintiffs alleged Joslyn failed to warn are dangers arising from burning treated wood and Joslyn claims that no EPA-approved label during the relevant time period contained any warning about such dangers; from this, Joslyn concludes that all plaintiffs' claims in this case concern a failure to warn of hazards not contained in EPA-approved label(s) and are therefore preempted by FIFRA.

Plaintiffs have responded to this argument by presenting evidence that during the relevant time period, numerous EPA-approved labels for creosote and pentachlorophenol contained warnings that these chemicals could cause harm if absorbed through the skin and that care should thus be taken to avoid such contact.[10] Many of these labels also warned that the fumes from these chemicals could be harmful and that care should be taken to avoid exposure to the fumes.[11] Plaintiffs thus submit that their claims based on Joslyn's failure to convey these warnings cannot be found to be preempted by FIFRA. Joslyn does not dispute that such claims, if pled, would not fall under FIFRA preemption. It insists, however, that plaintiffs' complaint in this case is limited solely to defendants' alleged failure to warn of dangers associated with *burning treated wood* and that plaintiffs have no evidence that *any* EPA-approved label warned against such dangers. Joslyn thus concludes that plaintiffs have no claim for failure to *convey* any EPA-approved warnings and hence no claims that are not preempted by FIFRA.

In the court's opinion, although plaintiffs' complaint does reference defendants' alleged failure to warn of the dangers of burning treated wood, the allegations are not so clearly limited, as the complaint repeatedly refers to the dangers posed by exposure to the chemically treated wood chips. Further, reason dictates that if one is to burn the wood, one must first handle

---

10. Joslyn has moved to strike plaintiffs' supplemental evidence consisting of label excerpts on procedural grounds. The court concludes that this motion to strike should be denied.

11. Although plaintiffs have not offered evidence as to warnings on any CCA labels that they contend should have been conveyed, the court concludes *infra* that summary judgment is in order as to plaintiffs' claims against Joslyn regarding harm caused by CCA inasmuch as plaintiffs have failed to come forward with sufficient proof that Joslyn ever used CCA at the Richton facility.

the wood, so that plaintiffs' complaint could fairly be construed as alleging a failure to convey an EPA-approved warning.[12] Accordingly, the court rejects defendants' assertion of FIFRA preemption as to plaintiffs' implicit allegation that defendants failed to convey EPA-approved warnings relating to the handling (if not the burning) of chemically treated wood products.

■ Plaintiffs argue additionally and/or alternatively that not all their claims are for failure to warn, and they point, in particular, to their claims for negligence in the sale of the chemically treated wood chips or for the sale of an unreasonably dangerous product. Plaintiffs reason that since no warning that could have been given would have made the wood chips safe for the purposes for which defendants actually sold the wood chips, i.e., for use in and around plaintiffs' homes, it follows that these claims are not for failure to warn and that consequently, they cannot be preempted by FIFRA.

In *Grenier v. Vermont Log Buildings, Inc.*, 96 F.3d 559 (1st Cir.1996), the court, considering a similar argument, observed that

> merely to call something a design or manufacturing defect claim does not automatically avoid FIFRA's explicit preemption clause. *In re DuPont–Benlate Litigation*, 859 F.Supp. 619, 623–24 (D.P.R.1994). Here, Vermont Log's only elaborated claim under this heading is that Woodlife was defectively designed or manufactured because it was foreseeable that it would be used on residences and it was unfit for this use. But this claim is effectively no more than an attack on the failure to warn against residential use and therefore is a preempted claim.

This certainly does not mean that every misdesign or mismanufacturing claim would be debarred by section 136v. In a batch of properly made products, one item might be defective or tainted; or perhaps one might design a pesticide that, while properly approved and labeled, was unduly dangerous for any legitimate use. In the former case, it is hard to see why FIFRA preemption would even be arguable; in the latter, there would be at most an implied preemption claim, based not on section 136v but on EPA's approval of the product; and it is by no means clear that such a preemption claim would prevail.

96 F.3d at 564–65.

In the case at bar, while it is apparent that there were uses for wood treated with the challenged pesticides that were sufficiently safe (assuming appropriate warnings, of course), the parties have not suggested whether or not there were any "legitimate uses" for the *wood chips* sold by Joslyn that would not have been "unduly dangerous," *see id.* Consistent with the court's reasoning in *Grenier*, which has logical appeal, this court, given the absence of any evidence in this record as to whether warnings of any kind could have made the wood chips reasonably safe for *any* use, is unable to conclude as a matter of law that FIFRA preempts plaintiffs' putative negligence and strict liability claims.

### Joslyn's Motion for Summary Judgment on Claims Based on Exposure to Chromated Copper Arsenate

■ In this motion, Joslyn contends that no issue of material fact exists regarding plaintiffs' alleged exposure to chromated copper arsenate (CCA) because these chemicals were never used by defendants

---

12. Of course, plaintiffs need not have affirmatively characterized any failure to warn as a "failure to convey an EPA-approved warning" since FIFRA preemption is a defense which plaintiffs are not required to anticipate in their pleading.

at their Richton facility. According to defendants, not only do plaintiffs lack any probative evidence tending to show that CCA was ever used at the Richton facility, but defendants' evidence shows convincingly that these chemicals were never used at the facility. Among other things, defendants point to the deposition testimony of several witnesses to the effect that the chemicals used to treat wood at the Richton facility were creosote and pentachlorophenol, and not CCA. Joe Powell, an employee of Joslyn during the entirety of its ownership of the Richton facility (with the exception of two years when he was drafted into military service in the late 1960s) and plant manager for American Wood until 1996, testified that the chemicals used by both companies at the facility were creosote and pentachlorophenol. William Powe, owner of American Wood, confirmed that American Wood used only creosote and pentachlorophenol and not CCA. And two Joslyn employees, Reuben McSwain and Clarence Hinton, testified that the chemicals used at the Richton facility were creosote and pentachlorophenol.

In addition, Joslyn points out the chemical manufacturer defendants that were originally sued by plaintiffs, which manufacturers collectively produced almost all of the CCA used in wood treatment, have submitted affidavits in which they declare that none of these companies ever sold CCA to the Richton facility. Joslyn notes, moreover, that the American Wood Preservers Association's statistics show no record of any CCA treatment being done at the Joslyn facility in Richton.

Finally, Joslyn maintains there is additional, conclusive evidence that CCA was not used at Joslyn's facility in the form of proof that the Richton facility was not even equipped to treat wood with CCA. In this vein, Joslyn has produced an affidavit from Craig McIntyre, who states,

Creosote and CCA treatments are completely incompatible and cannot be readily used in the same treatment cylinder. When a facility treats with both creosote and CCA, a separate cylinder is installed for the CCA treatment. The Richton facility had only one cylinder during the years that Joslyn operated the facility.

In their response to the motion, plaintiffs declare that Joslyn's claim that no CCA was used at Richton cannot be true because CCA has been found at the facility. To the point, they note that on March 26, 1996, actual chemical discharges of CCA from the Richton facility were measured, and that in 1997, the United States Environmental Protection Agency (EPA) reported the removal of 6.88 tons of sludge from the wood preservative storage tanks at Richton and the removal of .39 ton of sludge from wastewater treatment at the Richton facility, both of which contained reportable levels of chromium and arsenic. Plaintiffs thus conclude that the Richton facility obviously utilized CCA. According to plaintiffs, this conclusion is further supported by the fact that in its 2003 Form 10–K filed with the Securities and Exchange Commission, Danaher reported that wood treating facilities previously operated by Joslyn had used wood preservatives "that included creosote, pentachlorophenol and chromium-arsenic-copper." Plaintiffs deduce that since Richton was one of Joslyn's facilities, then "certainly, Joslyn would have utilized the same chemicals, including CCA," whether at Richton or any of its other facilities.

As for Joslyn's "single cylinder" argument, plaintiffs explain, through the affidavit of their expert Rod O'Connor, that while water-based CCA cannot be used in the same cylinder as creosote, oil-based CCA, which has been available to the industry for many years, is compatible with

creosote and may be used in the same cylinder. And based on all of this information, O'Connor opines that in his opinion, to a reasonable degree of scientific certainty ..., more likely than not, CCA chemicals were used at the subject plant during at least some of the time in which it was owned and operated by JMC.

In the court's opinion, the facts, even viewed in the light most favorable to plaintiffs, do not support this conclusion. As detailed *supra*, substantial affirmative proof has been adduced to show that the manufacturers responsible for nearly all CCA production for wood treatment never sold CCA for use at the Richton facility; that there is no record of any use of CCA at the facility; and that employees have affirmatively testified that the chemicals used by Joslyn at the facility were pentachlorophenol and creosote. Additionally, in reply to plaintiffs' assertion that oil-based CCA is compatible with creosote, defendants' expert, Mr. McIntyre, explains that he invented the first successful single-cylinder oil-based CCA treatment and that until 1986, which was six years after Joslyn sold the facility, there were no commercially available single-cylinder CCA–Oil emulsion treatments.

The only proof plaintiffs have mustered, in the face of this overwhelming evidence, are documents which at best, could be interpreted only to suggest the presence of some amount of CCA at the site of the facility many years after Joslyn's sale of the facility. This proof is insufficient to overcome Joslyn's summary the site of the facility many years after Joslyn's sale of the facility. This proof is insufficient to overcome Joslyn's summary judgment evidence. *See Arrington v. Southwestern Bell Telephone Co.*, 93 Fed.Appx. 593, 596 (5th Cir.2004) (explaining that "the non-moving party does not demonstrate the existence of a genuine issue of fact (and does not thereby avoid summary judg-

ment) by asserting 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence'") (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir.1994) (en banc)).

*Conclusion*

Based on the foregoing, it is ordered that Danaher's motion for summary judgment is granted; that Joslyn's motion for summary judgment based on preemption is granted in part and denied in part, as set forth herein; and that Joslyn's motion for summary judgment on plaintiffs' claims for damages resulting from exposure to chromated copper arsenate is granted.